MILTON J. NOELL AND ADELAIDE NOELL, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 925-73.    Filed July 19, 1976.

*Clinton J. Wofford, Jr.,* for the petitioners.
*James R. Turton,* for the respondent.

WILBUR, *Judge:* Respondent has determined a deficiency in petitioners' Federal income tax for the taxable year 1968 in the amount of $10,927.81.

Several issues have been settled by the parties and the following issues remain for our decision:

(1) Petitioners' basis in a 15.987-acre tract of land sold in 1968.

(2) Whether the petitioners' basis in a main airport runway and two adjacent taxiways should be added to the basis of 68 subdivided lots in an 85-acre tract.

(3) Whether petitioners are entitled to an investment tax credit in 1968 for their investment in the airport runway and two adjacent taxiways.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

The petitioners, Milton J. and Adelaide Noell, husband and wife, resided in Addison, Tex., at the time their petition was filed herein. They filed their joint income tax return for the year 1968 with the Director, Internal Revenue Service Center, Austin, Tex. Unless otherwise indicated, Milton J. Noell will be referred to as petitioner.

On July 29, 1968, petitioner sold a 15.987-acre tract of land in the Noah Good Abstract No. 520, Dallas County, Tex. (sometimes referred to as subject property), for $127,896.[1] The Noah Good Survey is a 640-acre tract located in what is now the city of Addison, Dallas County, Tex. The subject property was part of a larger 185-acre tract located in the Noah Good Survey. As of March 28, 1944, the subject property did not front on any street or road, although the 185-acre tract of which it was a part did have frontage on both Marsh Lane and Spring Valley Road. The 15.987-acre tract and the surrounding area were largely undeveloped in 1944 except for scattered residential properties. The area had not been incorporated into any city limits and public utilities were not available. The area was used primarily for pasture land.

Petitioner also owned an 85-acre tract of land in Collin County, Tex. This tract was subdivided into 68 homesite lots and an adjoining airport runway and two main taxiways. The development is known as the Air Park Estates, and its most important feature is that it allows homeowners to taxi their private aircraft alongside their homes. The homesite lots were for residential purposes only, although private hangars could be built if they were limited in size and incorporated into the architecture of the home.

The contract of sale contained several restrictive covenants, including the following:

The operation or construction of business houses, aircraft maintenance shops, hotels, boarding, lodging and/or apartment houses is likewise prohibited. Nothing herein contained shall be construed as preventing Air Park Associates or their assigns from erecting and maintaining recreational facilities or a community center for the benefit of the home owners.

However, the restrictive covenants specifically exempted "the commercial properties east of the landing strip" from this restriction and other restrictions that would inhibit the use of the commercial property for aviation-related businesses.

Air Park Associates, a copartnership composed of Milton J. Noell and David W. Noell, retained ownership of the main airport runway and two adjacent taxiways as well as the commercial property east of the runway where hangar space was

[1] Petitioner had expenses of sale amounting to $1,965.90. In addition, petitioner had capital expenditures totaling $5,985 which should be added to petitioner's basis in the 15.987-acre tract.

leased and it was contemplated that aviation-related commercial facilities would be erected. However, ownership of the main runway and two adjacent taxiways was retained subjèct to the following provisions of paragraph B of the contracts of sale of the individual lots:

B. An aircraft landing area being a minimum of 300 feet wide and 3,000 feet long will at all times be available to the homesites property owners via taxiways arranged according to said plat filed in Collin County, Map Records. Said landing area will be owned, controlled and maintained by Air Park Associates, their heirs or assignees at no cost to the homeowners for a minimum period of ten years and will continue thereafter until such time as said landing strip might cease to be economically feasible and at which time said strip and taxiways will be donated to the homeowners in exchange for access and usage privileges without charge to the donors except for a proportionate part of the maintenance cost which will be determined by a board of three independent appraisers, if necessary. In the event of discontinuance of use of said landing strip as an aircraft landing area, title to same will revert to the donors, their heirs or assignees.

Thirty-four of the lots in Air Park Estates were sold in 1966, 1967, and 1968.[2]

From late 1965 until October 22, 1968, petitioner was engaged in constructing the paved runway and two adjacent taxiways. The manufacturing process consisted of grading, hauling in dirt, supplying a rock base, laying the asphalt pavement, and some incidental sodding. Three layers of the rock base had to be laid into place and the runways had to be paved over with two layers of asphalt.

Prior to the time the runway was completed, airplanes landed on a grass strip. After the rock base was laid in place in 1967 some airplanes used the runway, but the roughness of the rock surface made it unsatisfactory for permanent use. Moreover, since the underlying black soil became sticky when wet, the rock surface was only usable under good weather conditions.

OPINION

The first issue to be decided is the basis of the 15.987-acre tract sold by petitioner in 1968. Petitioner inherited a remainder

---

[2] In 1968, the petitioner's basis in the 68 lots was $726.52 per lot, not including the cost of airport facilities. Petitioner's basis in the main airport runway and two adjacent taxiways, comprising 28.90 percent of the total 85-acre tract, was $58,588.39 ($35,532.07 comprising the cost of land, and $23,056.32 attributable to improvements). If the basis of these facilities is added to the basis in the 68 lots, there would be an added basis to each of $861.59, or a total basis of $1,588.11 per lot.

interest in this tract in March 1944 from his father. Petitioner's mother inherited a life estate in the same tract. In 1952 petitioner's mother relinquished to him whatever interest she had in the land, and as a result petitioner acquired a fee simple interest.

The basis of property acquired from a decedent is the fair market value of the property at the date of decedent's death.[3] Sec. 1014.[4] Accordingly, petitioner's basis in the property was the fair market value of the 15.987 acres on March 28, 1944, the date of his father's death.[5] Petitioner contends that the fair market value of the 15.987-acre tract on March 28, 1944, was between $750 and $1000 per acre. Respondent, relying on the expert testimony of his witness presented at trial, places the value of this property at $300 per acre at that time.[6]

Fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being reasonably informed as to all the relevant facts. *O'Malley v. Ames,* 197 F.2d 256 (8th Cir. 1952); *Harry L. Epstein,* 53 T.C. 459 (1969). After careful consideration of the evidence in the record, we find that the fair market value of the 15.987-acre tract as of March 28, 1944, was $450 per acre. In reaching this finding we looked at a number of factors affecting the value of the land, including the topography of the land, the highest and best possible use for the property at that time, the accessibility of the parcel, and comparable land sales in the immediate vicinity.

---

[3] If elected, the property may also be valued at an alternate valuation date, pursuant to sec. 2032, I.R.C. 1954, or Sec. 811(j), I.R.C. 1939. The date of death is the relevant valuation date here.

[4] Unless otherwise stated all statutory references are to the Internal Revenue Code of 1954, as amended.

[5] Although petitioner originally received a remainder interest in the property, and only came into possession of the full fee when his mother relinquished her life estate, petitioner's basis in the property must be determined as of the date of decedent's death. Sec. 1.1014-4(a)(2), Income Tax Regs., provides:

(2) Under the law governing wills and the distribution of the property of decedents, all titles to property acquired by bequest, devise, or inheritance relate back to the death of the decedent, even though the interest of the person taking the title was, at the date of death of the decedent, legal, equitable, vested, contingent, general, specific, residual, conditional, executory, or otherwise. Accordingly, there is a common acquisition date for all titles to property acquired from a decedent within the meaning of section 1014, and, for this reason, a common or uniform basis for all such interests. * * *

(See also sec. 1.1014-5(a)(2), Income Tax Regs., and sec. 1015.)

[6] In his statutory notice of deficiency, respondent assigned a value of $200 per acre to the property.

Respondent's expert witness, Mr. M. P. Christensen, placed primary reliance on eight land sales in the vicinity of petitioner's 15.987-acre tract. These sales took place from 1939 to 1945 and the prices ranged from $150 to $400 per acre.[7] Except for one sale in 1945, each of the sales examined by Mr. Christensen took place prior to 1944. Two of these sales took place in 1939, with the land selling for $350 per acre. Mr. Christensen did not examine the resale of these two properties in February 1946 for approximately $750 per acre. While we recognize that the value of land in the area took a sharp upturn after World War II, and that the comparatively stable prices prior to 1944 provide a more certain guide to land values in the area, we nevertheless believe that the later sales are also useful in determining the 1944 value of the subject property.[8]

Petitioner arrived at a value in 1944 of $750 to $1,000 per acre. Petitioner presented no expert witnesses but based his conclusion on his own familiarity with the area. Unfortunately, petitioner has presented little tangible evidence to support his view. He notes that his estimation of value reflected its worth to his family. Furthermore, he asserts that the refusal of his father to sell for less was vindicated by the sharp rise in the value of the land in future years. It is clear, however, that the fair market value at a given point in time cannot be arrived at through the use of hindsight. It is no less clear that a person's subjective view of the value of property does not necessarily reflect its fair market value. While one of the elements carefully considered, petitioner's testimony must be weighed in the light of these problems.

The next issue for decision is whether the cost of constructing airport facilities should be added to petitioner's basis in the subdivision lots. It is well established that a subdivider of real property may include in the cost basis of each lot a pro rata portion of expenses incurred for other land or improvements which benefit the development as a whole. This principle has been applied to the cost of streets and drives, the cost of constructing water and sewage systems, the cost of recreation areas, and payments made to utility companies to obtain service

---

[7] The $400-per-acre price must be discounted somewhat by the two-story dwelling on the property at the time of the sale. The entire tract was 50.2 acres.

[8] The two sales in 1946 were of property only about one-half mile from the subject property. Too direct a comparison of prices, however, is misleading since the two properties sold in 1946 have more desirable topographical features and greater accessibility.

for the purchasers of the lots. *Commissioner v. Laguna Land & Water Co.,* 118 F.2d 112 (9th Cir. 1941); *Willow Terrace Development Co. v. Commissioner,* 345 F.2d 933 (5th Cir. 1965); *Country Club Estates, Inc.,* 22 T.C. 1283 (1954); *Colony, Inc.,* 26 T.C. 30 (1956), affd. on other issues 244 F.2d 75 (6th Cir. 1957); *Albert Gersten,* 28 T.C. 756 (1957), affd. in part and remanded in part on different issues 267 F.2d 195 (9th Cir. 1959); *Derby Heights, Inc.,* 48 T.C. 900 (1967). See also *Biscayne Bay Islands Co.,* 23 B.T.A. 731 (1931).

When the subdivider constructs a facility for the benefit of the development, without reserving any significant future benefit for himself other than enhancing the value of the remaining parcels, it is appropriate to treat his expenditures as part of the cost of the benefited parcels. Where, however, the subdivider retains full ownership and control of the other land or improvements, we have held that he cannot add the cost of these facilities to the basis of each lot sold. *Colony, Inc., supra.* The rule was stated in *Estate of M.A. Collins,* 31 T.C. 238, 256 (1958):

if a person engaged in the business of developing and exploiting a real estate subdivision constructs a facility thereon for the basic purpose of inducing people to buy lots therein, the cost of such construction is properly a part of the cost basis of the lots, even though the subdivider retains tenuous rights without practical value to the facility constructed (such as a contingent reversion), but if the subdivider retains "full ownership and control" of the facility and does "not part with the property [i.e., the facility constructed] for the benefit of the subdivision lots," then the cost of such facility is not properly a part of the cost basis of the lots.

In the instant case, it is true that the airstrip and related facilities were constructed to facilitate the sale of lots within the subdivision and that the landing facilities were an integral part of the 85-acre development. Nevertheless, we are of the view that petitioner retained sufficiently complete control and ownership over the landing facilities for ancillary but independent commercial exploitation that they represent a separate asset whose cost is not properly allocable to the cost of the lots.

The contract between Air Park Associates and each lot purchaser provided that:

Said landing area will be owned, controlled and maintained by Air Park Associates, their heirs or assignees at no cost to the homeowners for a minimum period of ten years and will continue thereafter until such time as said landing strip might cease to be economically feasible and at which time said strip and taxiways will be donated to the homeowners * * *. In the event of dis-

continuance of use of said landing strip as an aircraft landing area, title to same will revert to the donors, their heirs or assignees.

The agreement did not provide that the facility would be given over to the lot owners at some date certain, and after 10 years the property owners could be charged for use of the airport facilities. Only if any charges ultimately levied against the lot owners and other users, as well as income from the airport related commercial facilities that were contemplated,[9] were not adequate to operate the landing facilities on an "economically feasible" basis would they be donated to the property owners. The contractual language itself contemplates substantial independent commercial use of the landing facilities.

The effect of this agreement and attending circumstances is to make the airstrip facilities commercially separate from the surrounding lots. Petitioner had commercial interests in these facilities on which he hoped to realize further income. In addition, the agreement provided no restriction against the expansion of these interests.

The critical question is whether petitioner intended to hold the facilities to realize a return on his capital from business operations, to recover his capital from a future sale, or some combination of the two; or whether, on the other hand, he so encumbered his property with rights running to the property owners (regardless of who retained nominal title) that he in substance disposed of these facilities, intending to recover his capital, and derive a return of his investment through the sale of the lots.[10] Each case must turn on its facts without the assistance of any litmus paper test. We believe, for the reasons indicated, that the facts of this case fall into the former category, precluding petitioner from attributing the cost of the airport facilities to the adjacent lots.

---

[9] The record contains a plat of the development indicating that in the commercial area between the entrance road and the runway, some or all of the following commercial facilities were contemplated: a cafe, an air motel, stores, a shop (apparently for airplane maintenance), and hangar space for lease. Petitioner was deriving significant income from hangar rentals in 1968, the year before the Court.

[10] Actually, in most of the cases, the asset involved is encumbered with rights running to the property owners which significantly diminish the value of an asset which nevertheless retains substantial value. This diminution, resulting from restrictions benefiting the adjacent lots, represents a pro tanto disposal with each lot. However, there is no basis in the decided cases, and certainly none in the record before us, for making an allocation based on the rights disposed of and the property retained.

The facts before us are to be sharply distinguished from those present in *Country Club Estates, Inc.,* 22 T.C. 1283 (1954). In that case the taxpayer was likewise engaged in the building of subdivision lots. As part of a plan to induce people to purchase these lots, the taxpayer deeded one-half of the tract to a nonprofit country club on which a golf course was later built. We held that the cost of the land donated to the country club was to be treated as part of the cost of the lots. The instructive feature of *Country Club Estates* is that the taxpayer there parted with the ownership of the land for the benefit of the adjacent property owners. Here, by contrast, petitioner retained ownership for separate commercial exploitation. It is this distinction which is critical to our determination.

Petitioner argues that the application of the guidelines set forth in *Willow Terrace Development Co. v. Commissioner,* 345 F.2d 933 (5th Cir. 1965), would produce a different result than the one we have reached above. In deciding whether the water and sewage systems built by the taxpayer there should be added to the cost of the lots, the Fifth Circuit noted at page 938:

Some relevant factors to be considered in determining the proper tax treatment of the costs of such facilities are whether they were essential to the sale of the lots or houses, whether the purpose or intent of the subdivider in constructing them was to sell lots or to make an independent investment in activity ancillary to the sale of lots or houses, whether and the extent to which the facilities are dedicated to the homeowners, what rights and of what value are retained by the subdivider, and the likelihood of recovery of the costs through subsequent sale. * * *

An examination of the instant case with emphasis on these factors only reinforces our conclusion that the cost of the landing facilities should not be added to the basis of the lots. While the airport facilities were important to the sale of the lots, petitioner also regarded these facilities as an independent investment activity. The subdivider retained the ownership of virtually all rights in the property, subject to the restrictive covenants.

The agreement gave Air Park Associates the right to commercially exploit the landing facilities, and there was no prohibition against Air Park Associates selling the facility subject to the restrictive covenants. Moreover, the landing strip and main taxiways were not surrounded by the lots. All of the lots were directly west of the landing facilities, and while connected to the facility by a series of taxiways the airstrip could neverthe-

less be owned and used for the foreseeable future as an income-generating activity separate from the income realized from the sale of lots. Thus the cost of the facilities could be recovered in a subsequent sale, or through depreciation and income from commercial usage. We therefore hold that under the circumstances here present the cost of the landing facilities may not be added to the basis of the lots in Air Park Estates.

The final issue for our determination is whether petitioner is entitled to an investment credit on the runway and taxiway improvements. Respondent argues at the outset that petitioner is not entitled to an investment tax credit since he did not claim the credit on his return or in his petition, but raised the issue for the first time at the trial of this case. Despite respondent's objections, respondent knew in advance that this issue would be presented at trial, had the opportunity to cross-examine petitioner, and argued the question on brief. Furthermore, in examining petitioner's books and records for the purpose of computing allowable depreciation on the runway improvements, respondent focused on facts which would establish the amount of an allowable investment credit. Consequently, we find that respondent was not prejudiced by the presentation of this issue.

Moreover, the investment credit question was ancillary to the issue of whether petitioner's costs in constructing the airport facilities should be added to the basis of the lots. If the airstrip expenditures were not properly includable in the basis of the lots, then it is evident that there are other issues, including the investment credit, with respect to the tax rules relating to capital recovery. Indeed the parties stipulated the amount of depreciation allowable assuming the cost of the landing facility may not be allocated to the basis of the lots. We believe consideration of this issue is necessary for a fair resolution of the taxes properly due and owing. Rule 1(b), Tax Court Rules of Practice and Procedure.[11]

Sections 38 and 46 allow as a credit against income tax a specified percentage of the taxpayer's qualified investment for the taxable year.[12]

---

[11] See Rule 41(b), and 3 Moore, Federal Practice, par. 15.13 (2d ed. 1974).

[12] Subject to certain limitations not applicable here. Sec. 46(c) provides:

(c) QUALIFIED INVESTMENT.—

(1) IN GENERAL.—For purposes of this subpart, the term "qualified investment" means, with respect to any taxable year, the aggregate of—

(A) the applicable percentage of the basis of each new section 38 property (as

The first substantive issue with respect to petitioner's claim for an investment credit is whether the main runway and two taxiways were placed in service in 1968. Section 1.46-3(d) of the Income Tax Regulations provides that section 38 property [13] will be considered as placed in service the earlier of:

(i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or

(ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity.

In the instant case, the issue is when the landing strip was placed in a state of availability for a specific function in petitioner's trade or business. Respondent argues that since airplanes began to use the runway after the rock was laid in place in 1967, the runway was placed in service that year. Petitioner, on the other hand, contends that the use of the runway during the time

---

defined in section 48(b)) placed in service by the taxpayer during such taxable year, plus

(B) the applicable percentage of the cost of each used section 38 property (as defined in section 48(c)(1)) placed in service by the taxpayer during such taxable year.

(2) APPLICABLE PERCENTAGE.—For purposes of paragraph (1), the applicable percentage for any property shall be determined under the following table:

| If the useful life is— | The applicable percentage is— |
|---|---|
| 3 years or more but less than 5 years | 33⅓ |
| 5 years or more but less than 7 years | 66⅔ |
| 7 years or more | 100 |

For purposes of this subpart, the useful life of any property shall be the useful life used in computing the allowance for depreciation under section 167 for the taxable year in which the property is placed in service.

[13] We believe that the landing strip and two main taxiways constitute sec. 38 property, and respondent concedes as much in Rev. Rul. 69-329, 1969-1 C.B. 30, and does not really contend otherwise in this litigation. Sec. 48 defines sec. 38 property as follows:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

* * *

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more.

its construction was still in progress did not mean that the facility had been placed in service. We agree with petitioner.

The runway was not "in a condition or state of readiness" in 1967. The rock surface on which some planes landed in 1967 was clearly only a stage in the construction of the facility. This surface was quite unsatisfactory and pilots risked damaging their aircraft by landing on it. Moreover, the rock surface could not be used on a permanent basis, since the landing area easily could be ruined by the weather. In fact, the runway here had been ruined three times before petitioner finally put the pavement down.

In short, the facility was simply not available for full service until the runway was paved in 1968. We therefore hold that the landing facilities were not placed in service until that year.

Finally, respondent argues that there is no evidence establishing a useful life of the airport runway and two adjacent taxiways from which an investment tax credit can be established. We find this to be an unpersuasive argument, in view of the fact that respondent has stipulated depreciation allowable on the runway and taxiways in 1968.[14] After carefully reviewing the entire record, we conclude that in the circumstances here present petitioner is entitled to a full investment credit on the airport runway and two main taxiways for the taxable year 1968. Cf. Rev. Proc. 62-21, 1962-2 C.B. 418, with subsequent modifications.

*Decision will be entered under Rule 155.*

---

[14] Unfortunately, respondent evinced more interest in preventing the issue from being raised than in fairly resolving it. Nevertheless, the useful life assumed in the stipulation appears to be 10 years, and on the basis of all of the evidence, we feel quite certain that the runway and taxiways had a useful life of 8 years or more.