JOHN W. DOHERTY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Doherty v. Commissioner
Docket No. 8439-90
United States Tax Court
T.C. Memo 1992-573; 1992 Tax Ct. Memo LEXIS 595; 64 T.C.M. (CCH) 915; September 28, 1992, Filed *595 Decision will be entered for respondent. For Petitioner: James A. Swigart. For Respondent: Randall E. Heath. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined Federal income tax deficiencies and additions to tax for petitioner's 1983, 1986, and 1987 taxable years as follows: Additions to Tax
Years
Income Tax
Sec. 6653(a)(1)(A)
Sec. 6653(a)(1)(B)
Sec. 6661
1983
$ 3,880
--  --
--  1986
25,545
$ 1,227
[1] $ 6,136
1987
5,136
--  --
--  All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. The issues for consideration are: (1) Whether petitioner's sailboat was placed in service in an activity for profit on or before December *596 31, 1986; (2) whether petitioner's sailboat is qualifying transition property within the meaning of section 49; (3) whether petitioner is subject to additions to tax for negligence or intentional disregard of rules or regulations under section 6653(a)(1)(A) and (B) for the taxable year 1986; and (4) whether petitioner is subject to an addition to tax for substantial understatement of tax liability under section 6661 for the taxable year 1986. FINDINGS OF FACT Some of the facts have been stipulated and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of the filing of the petition herein, petitioner resided in Tacoma, Washington. Petitioner filed joint Federal income tax returns for the 1983, 1986, and 1987 taxable years with Robylee K. Doherty, who did not join in the filing of the petition. Petitioner was employed as an airline pilot by Northwest Airlines during the years in question. Petitioner was an experienced sailor prior to the period under consideration. During 1984 and 1985, petitioner investigated the purchase of a performance cruising sailboat from Portside Yachts in Seattle, Washington. Petitioner was interested in *597 using the boat in a charter business for 5 years and then converting the boat to personal use. During July 1985, Portside Yachts gave petitioner information about the cost and available options for a "CT-47PH" yacht. Later that same year, petitioner learned about the imminent repeal of the investment tax credit. Therefore, on November 20, 1985, petitioner sent or gave Portside Yachts a letter expressing his intention to purchase a "CT-44PH", which is a smaller sailboat than the one petitioner originally investigated, based on the information in the July letters. Petitioner also gave Portside Yachts a check for $ 100, which the owner of Portside Yachts, Mr. O'Neill, deposited immediately. At this point, the boat had not been ordered from the manufacturer. Petitioner and Mr. O'Neill continued negotiating about specific options and other details necessary to order the yacht. During this time, Portside Yachts was in contact with the builder of the vessel in Taiwan. Based on all negotiations, petitioner and Portside Yachts executed the "Contract and Purchase Agreement" on April 17, 1986. The agreement executed was typical of the contracts used by Portside Yachts. Upon execution *598 of the agreement, petitioner paid a 20-percent deposit. The purchase price of the boat, including all options but not the cost of delivery, was $ 142,754.50. Portside Yachts placed the order for the custom yacht with the builder in Taiwan after petitioner and Portside Yachts entered into the April 17th agreement. Under the terms of the agreement, petitioner was legally committed to pay the balance of the purchase price. Portside Yachts' usual practice was to accept a small deposit from a customer before they started preliminary work to order a boat. The deposit was nonrefundable. Once Portside Yachts and a customer signed a formal contract and a 20-percent deposit was paid, Portside Yachts ordered the boat from the builder. Before the "Contract and Purchase Agreement" was signed, a buyer could back out at any time. Petitioner's boat, the "Emerald Ace", was completed and available for use in Taiwan in late August of 1986. During the month of June, petitioner advertised the "Emerald Ace" for charter from Taiwan in a letter sent to various yacht clubs and one advertisement in a U.S. newspaper; however, petitioner did not advertise in Taiwan or any Asian country. No one chartered *599 the boat in the Sea of Japan. Petitioner accepted delivery of the boat in Taiwan in August 1986 and hired David Allardice to deliver the boat to Seattle. Petitioner, his 15-year-old daughter, Mr. O'Neill (the seller of the boat), and Mr. Allardice set sail from Taiwan for Seattle on September 3, 1986. Despite the fact that no one on the boat was licensed by the U.S. Coast Guard to carry passengers for hire, and petitioner did not have insurance to cover charter passengers, petitioner advertised one of the five available berths for charter on the trans-Pacific voyage. No one accepted petitioner's offer to charter the berth for $ 2,000. On their voyage, the crew of the "Emerald Ace" experienced unfavorable winds, and as a consequence the crossing took longer than expected. The boat made an unscheduled stop in Japan on September 16, 1986, because petitioner had to get back to his job in the United States. Petitioner, his daughter, and Mr. O'Neill flew back to Seattle from Japan. Other crew members joined Mr. Allardice and they continued the trip to Seattle. On the trip from Japan to Seattle, the "Emerald Ace" was damaged in a storm. [1] Storm damage to the yacht consisted of *600 a broken mast, water damage to the hull, a broken refrigerator system, and some cosmetic damage. The crew was able to rig a mast by lashing the vessel's boom to the stub of the mast, and was able to sail to Seattle on their own. Mr. Allardice arrived with the "Emerald Ace" in Seattle in late November 1986. When the "Emerald Ace" arrived in Seattle, the diesel engine was not damaged, but the mast was broken in several places. The boat could not be chartered as a sailboat because of the broken mast. At this time, the yacht did not meet minimum U.S. Coast Guard standards because it lacked running lights and a throwable cushion on board. The "Emerald Ace" was fully insured for the damage sustained in the trans-Pacific crossing, except for a $ 5,000 deductible. The policy issued for the period beginning *601 on August 15, 1986, and in force throughout the balance of 1986, was not a commercial policy and had been issued for personal or nonbusiness use. A commercial policy (which is customarily used for charter boats) would have required additional premiums. Petitioner made no attempt to obtain commercial coverage until April 1987. On April 2, 1987, the insurance company's representative approved the cost of the repairs to the boat. The repair work was done by Portside Yachts at a cost of $ 27,895.33. The insurance carrier contacted petitioner in a letter dated June 10, 1987, informing petitioner that the company was prepared to make payment on the claim, but they needed to know how to make out the check. Petitioner contacted the insurance company sometime between June 10, 1987, and June 15, 1987, and informed them that he still owned the boat and that the check was to be made payable to him. Petitioner received a check dated June 15, 1987, from the insurance carrier in the amount of $ 22,895.33. On December 22, 1986, petitioner entered into a contract with Adventure Charters to serve as the exclusive listing agent for chartering "Emerald Ace" for the 1987 sailing season. At the *602 time the contract was entered into, petitioner had not repaired the boat. Repairs were completed by March 20, 1987. Petitioner delivered the "Emerald Ace" to the docks of Adventure Charters in LaConnor, Washington, in early May 1987. Petitioner did not obtain commercial insurance coverage for the boat until April 1987. The "Emerald Ace" was first chartered after petitioner delivered it to Adventure Charters. The "Emerald Ace" was not placed in service until after December 31, 1986. Petitioner filed his 1986 Federal income tax return on June 22, 1987, claiming a $ 27,895.33 casualty loss for the damage to the "Emerald Ace". Petitioner's accountant prepared the first draft of the return claiming a $ 5,000 casualty loss, which was the amount of petitioner's deductible. On the second draft, the return was changed to deduct the full amount of the damage. This change was made at petitioner's request. Petitioner told his accountant that he could not estimate the reimbursement from the insurance company and that the full amount of the loss should be deducted as a casualty loss. Petitioner also claimed an investment tax credit of $ 14,680, an amount representing 10 percent of petitioner's *603 basis in the sailboat. To reach the basis amount, petitioner capitalized the costs of delivering the boat from Taiwan to Seattle. Petitioner also claimed depreciation expense of $ 19,818 in 1986, and depreciation expense of $ 29,332 in 1987. OPINION When Was "Emerald Ace" Placed in Service
We consider first the threshold issue of when petitioner's boat was placed in service. Depreciation and the investment tax credit are first allowed for qualifying property in the year in which the property was placed in service in an activity entered into for profit. Secs. 38, 46, 167; sec. 1.167(a)-10(b), Income Tax Regs.Section 1.167(a)-11(e)(1)(i), Income Tax Regs., provides in part: Property is first placed in service when first placed in a condition or state of readiness and availability for a specifically assigned function * * *. In general the provisions of paragraph (d)(1)(ii) and (d)(2) of section 1.46-3 shall apply for the purpose of determining the date on which property is placed in service * * * Section 1.46-3(d), Income Tax Regs., provides in part: (d) Placed in service. (1) For purposes of the credit allowed by section 38, property shall be considered placed *604 in service in the earlier of the following taxable years: (i) The taxable year in which, under the taxpayer's depreciation practice, the period for depreciation with respect to such property begins; or (ii) The taxable year in which the property is placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity. Petitioner contends that the "Emerald Ace" was placed in service in August 1986 when the boat was available for charter in Taiwan. Respondent asserts that the boat was not placed in service until 1987, when it was delivered to Adventure Charters. For reasons expressed below, we agree with respondent. Petitioner argues that the boat was in a "state of readiness" when it was completed in Taiwan. The boat was sailable and he advertised for charters at this time, although no one accepted petitioner's offer. Petitioner relies on Sears Oil Co. v. Commissioner, 359 F.2d 191 (2d Cir. 1966), affg. in part, revg. and remanding in part T.C. Memo. 1965-39, in support of his *605 contention that property is placed in service when it is first available for use, not when it is first used. Therefore, petitioner asserts that the "Emerald Ace" was placed in service in 1986, even though it was not used until 1987. Sears Oil Co., is factually distinguishable from this case. In Sears, the taxpayer was already in the business for which the depreciable asset was to be used. Here, petitioner purchased the "Emerald Ace" so he could enter into the sailboat charter business, not as part of an existing business. See Piggly Wiggly Southern, Inc. v. Commissioner, 84 T.C. 739, 746-748 (1985), affd. 803 F.2d 1572 (11th Cir. 1986). Respondent argues that the "Emerald Ace" was not placed in service in 1986 because it was not in a state of readiness for its specifically assigned function. Respondent contends that the delivery from Taiwan to Seattle was activity in preparation of entering a trade or business, and not business activities themselves. Respondent points out that the trans-Pacific crossing could not have been entered into for profit, because petitioner only advertised one berth for charter when *606 more were available. The advertised cost of the berth, $ 2,000, could not cover the expenses of the trans-Pacific crossing. [2] Respondent argues that, at most, petitioner was trying to minimize his delivery expenses and was not placing the boat in service. In Piggly Wiggly Southern, Inc. v. Commissioner, supra at 748, this Court noted that in order for property to be placed in service, taxpayers must do everything in their power to place the equipment into service. Petitioner only made minimal efforts to advertise the boat for charter in the Sea of Japan and for the trans-Pacific crossing. Additionally, at this time the boat was not properly insured for commercial use nor did it have a captain *607 licensed to carry charter passengers. Therefore, petitioner did not take the actions which would place the "Emerald Ace" in service in 1986. In Noell v. Commissioner, 66 T.C. 718 (1976), this Court held that use of an asset during construction may not meet the requirement that the asset be placed in service. In Noell, the taxpayer's runway was being used while the taxpayer was still preparing the runway for use in a trade or business. This Court held that the runway was not in a state of readiness because it was not available for full service. Noell v. Commissioner, supra at 728-729. Petitioner's advertising the sailboat for charter for the delivery voyage was merely an attempt to reduce the cost of the delivery. Petitioner's treatment of the delivery expenses as capital and nondeductible is consistent with our finding that the trip was in preparation to placing the boat in service and not in itself the time when the boat was placed in service. We find that the boat was not placed in service and was not in a state of readiness for the specifically assigned activity of being a charter sailboat in 1986. Petitioner *608 also argues that the boat was placed in service in December of 1986 when petitioner entered into the contract with Adventure Charters. Even though the boat was damaged, petitioner contends that it was in a state of readiness because the diesel engine was operational and the boat could be used as a powerboat. We are not persuaded by this argument. Petitioner's boat was to be used as a charter sailboat, not a powerboat. Alternate use is not sufficient for an asset to be placed in service. See Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987); Valley Natural Fuels v. Commissioner, T.C. Memo. 1991-341, on appeal (9th Cir., Oct 28, 1991). Because the "Emerald Ace" was not placed in service until 1987, petitioner is not entitled to an investment tax credit or a depreciation deduction for 1986. Having found that the sailboat was not placed in service during 1986, we need not decide whether the sailboat was qualifying transition property under section 49. Additions to Tax Under Section 6653(a)(1)(A) and (B)
Section 6653(a)(1)(A) provides that where any part of an underpayment of income tax is due to negligence *609 or intentional disregard of the rules or regulations, an amount equal to 5 percent of the underpayment shall be added to the tax. Section 6653(a)(1)(B) provides for an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. For purposes of the statute, negligence is the "'lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Neely v. Commissioner, 85 T.C. 934, 947 (1985) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967)). Respondent argues that petitioner is liable for the negligence additions due to his handling and reporting of the casualty loss regarding the "Emerald Ace". Section 165 allows a deduction for a casualty loss, but the deduction is limited to the amount not reimbursed by insurance. The regulations provide that no portion of the loss with respect to which reimbursement may be received is deductible. Sec. 1.165-1(d)(2)(ii), Income Tax Regs.
Petitioner knew the amount of the damage to the "Emerald Ace" when his *610 1986 return was filed. Petitioner also had been contacted by his insurance agent and informed that the claim was approved and that payment was on the way. The check issued by the insurance company to petitioner was dated prior to the time petitioner filed his 1986 return. We do not agree with petitioner's statement that he could not reasonably estimate the amount of the reimbursement at the time the 1986 return was filed. We hold that petitioner is liable for the additions to tax under section 6653(a)(1)(A) and (B). Addition to Tax Under Section 6661
Section 6661 provides an addition to tax for a substantial understatement of income tax. A substantial understatement is an understatement for the taxable year which exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return. In his brief, petitioner's entire argument was that he "should not be subjected to the penalties imposed by I.R.C. 6661, since Petitioner owes none of the deficiencies that were assessed by the IRS." Petitioner did not argue that he met any statutory exception. Respondent's determinations are presumed to be correct, and petitioner bears the burden of proof to show that *611 respondent's determination is incorrect. Rule 142(a). Petitioner offered no evidence to show that respondent's determination was incorrect. Therefore, petitioner has not met his burden and is liable for the addition to tax under section 6661. Decision will be entered for respondent. Footnotes
1. 50 percent of the interest payable with respect to the portion of such underpayment which is attributable to negligence.↩
1. The crossing from Taiwan to Seattle in Sept. can be dangerous because of rough sea conditions. Storms are not unusual during the fall and petitioner could have reasonably expected the possibility of damage to his boat.↩
2. Petitioner could not have reasonably expected to successfully charter the berth for two reasons. First, he only advertised one berth which would mean that someone would have to travel alone. Second, the weather conditions during that time of the year would not make for a pleasant trip.↩