85 GORGONIO WIND GENERATING CO., SANDRA KARDOS, TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
85 Gorgonio Wind Generating Co. v. Commissioner
Docket No. 25890-89
United States Tax Court
T.C. Memo 1994-544; 1994 Tax Ct. Memo LEXIS 552; 68 T.C.M. (CCH) 1071; 68 Trade Cas. (CCH) P1071; October 31, 1994, Filed *552 Decision will be entered under Rule 155. For petitioner: Walter Weiss. For respondent: Jeffrey M. Wong. DAWSON; GOLDBERG
DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: This case was assigned to Special Trial Judge Stanley J. Goldberg, pursuant to the provisions of section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE GOLDBERG, Special Trial Judge: In a Notice of Final Partnership Administrative Adjustment (FPAA) respondent determined the following adjustments to the partnership returns of 85 Gorgonio Wind Generating Co. (the partnership) for taxable years 1985 and 1986: Adjustment
1985
1986
Depreciation/at risk
$ 68,773 $ 136,425
Basis of depreciable/sec. 38 prop. 780,000
--
Net earnings from self-employment 68,773 137,350
*553 The issues for decision are: (1) Whether the partnership's investment in two wind turbine generators had economic substance and was entered into with a bona fide profit motive; and (2) whether the wind turbine generators were placed in service for Federal income tax purposes during 1985 or 1986. FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the first stipulation of facts, the second stipulation of facts, and the exhibits attached thereto are incorporated in our findings by this reference. The partnership's principal place of business at the time the petition was filed was in the State of California. Petitioner Sandra Kardos (petitioner) is the tax matters partner of the partnership. Petitioner is a Certified Public Accountant and holds a master's degree in accounting from California State University, Los Angeles, and a master's degree in taxation from Golden Gate University. She served as the partnership's accountant and supervised preparation of the partnership tax returns. Petitioner received an annual management fee of $ 7,800 for her services to the partnership. Charles Brink (Mr. Brink) has maintained a personal relationship with petitioner *554 for a number of years and works with her as the operations manager for her accounting practice. He has a degree in engineering from the University of California at Los Angeles. Mr. Brink served as manager of the partnership. Background
1. San Gorgonio Pass Windpark Development. Interest in developing wind energy systems as an alternative energy source increased in the early 1980s, particularly in California. According to a study done in July 1986, 90 percent of the world's wind-generated electricity at that time was purchased by California's two major utilities, Southern California Edison and Pacific Gas and Electric Company, and approximately 3 percent of the overall sales of electrical power in California was derived from wind generation systems. A number of areas in California have been studied for feasibility of wind generation projects, including the San Gorgonio pass near Palm Springs, California. Higher wind speeds are recorded in the San Gorgonio Pass in the summer months than in other seasons. Consistent wind speeds sufficient to produce electricity by means of wind turbine generators are usually not experienced in that area during the winter months. *555 Nevertheless, the San Gorgonio Pass has been considered a viable area for wind electrical generation projects, in part because the demand for electricity in Southern California is greater during the summer months and the price paid by utilities to producers of electric power is higher in times of peak demand. Preparation of a site or space for a wind turbine entails the pouring of concrete foundations for the wind turbine towers and establishing the electrical infrastructure through a "grid" system and electric substation to connect the wind turbine generators to an electric utility; in this case, Southern California Edison. Connection to the grid allows both transmission of electricity produced by wind turbines to the grid, and transmission of electricity from the grid to the wind turbine. In 1983, Sandberg Wind Corporation (Sandberg) installed approximately 130 wind turbines on Section 28 in the San Gorgonio Pass, an area also known as the Mesquite Windpark (the windpark). The windpark is located on a section of Federal Government land leased from the Bureau of Land Management under a 30-year lease and two additional parcels of land leased from Southern California Edison. In *556 June 1984, Southern California Edison entered into a contract with Sandberg to purchase electrical power generated by wind turbine generators in the windpark. Under that contract, Southern California Edison agreed to pay Sandberg scheduled, increasing amounts per kilowatt hour (kWh) for the first 10 years of the 30-year contract, and thereafter to pay according to its published avoided cost of energy. Additional wind turbines were installed in the windpark in 1984 and 1985. By December 1985, Sandberg had leased sites to more than 700 different persons and entities who owned or operated wind turbines in the windpark. Sandberg was responsible for maintaining and operating a small percentage of the windpark's turbines during the years at issue. 2. The Dynergy 180 kW Wind Turbine Generator. In 1985, one of Sandberg's tenants, International Dynergy Inc. (Dynergy), offered to trade Sandberg two wind turbine systems in exchange for use of several sites in the windpark for installation of additional Dynergy wind turbines. Dynergy and Sandberg agreed that the value of the sites to be provided to Dynergy by Sandberg in exchange for the two wind turbines was approximately $ 400,000. *557 Sandberg accepted the two turbines as full payment for Dynergy's use of the additional sites. The type of wind turbine conveyed to Sandberg by Dynergy under this arrangement was a new model, the Dynergy 180 kW (Dynergy 180), developed by Dynergy, LACADRE, Inc., and Sumitomo Heavy Industries, Ltd. (Sumitomo). The name reflects the estimated kilowatt output per hour of the wind turbine. The Dynergy 180 system had a design life of 20 years. The Dynergy 180 wind turbines are large, three-blade turbines mounted on 160-foot towers. For ease of maintenance, the towers are hinged and may be tilted down, allowing the wind turbine to be lowered to the ground without being removed from the tower. Equipped with the recommended 31.5-foot blades on a rotor hub 2.1 feet in diameter, the hub and blade component of the Dynergy 180 has an overall diameter of 65 feet. According to design specifications, each wind turbine, excluding the 160-foot tower, weighs 13,260 pounds. The weight of the steel tower with the gin pole used to raise the tower from the lowered position brings the total combined weight of the assembled wind turbine to 33,260 pounds. The Dynergy 180 drivetrain, manufactured *558 by Sumitomo, includes the rotor assembly (excluding blades), braking systems, centrifugal switch, axles, yaw drive motor, and a three-phase induction generator. When connected to a grid, electricity flows from the grid through an induction generator, creating an electromagnetic field, which then acts upon coils of wire within the generator to cause the generator's axle to spin at the specified rate of revolutions per minute (RPM). The wind turbine generators either produce or use electricity depending upon windspeed. When windspeed exceeds "cut-in" speed (11 miles per hour for the Dynergy 180), the wind turbine system electromagnetically generates electricity which is transmitted to the grid. When windspeed is below the cut-in speed, the generator acts as an electric motor and draws electricity from the grid to turn the generator axle and blades. The drivetrain is designed to operate within a specific RPM range. Runaway or overspeed conditions, where the turbine axle exceeds the maximum safe RPM capability, may occur when the turbine's connection to the grid is disrupted so that the braking effect of the induction generator electromagnetics is removed. The wind turbine braking *559 system was designed to decelerate or stop rotation of the drivetrain axle to prevent overspeed and to allow for shutdown of the turbine. The blade design specified for the Dynergy 180 also uses aerodynamic stall to reduce the efficiency of the blades in operating the drivetrain in high wind speed conditions, lessening the possibility of overspeed. The designers of the Dynergy 180 specified use of fiberglass composite blades 31.5 feet in length. The parties have referred to these blades as Livesay blades, after the name of the manufacturer. When attached to the hub, the swept area of the Livesay blades is 65 feet. Use of shorter blades means that increased wind speed is necessary to produce electricity and significantly lessens the productivity of the wind turbine. During normal operation, the rotor and blades of the Dynergy 180 are located on the side of the tower opposite the wind direction, a configuration known as a downwind turbine. The Dynergy 180 was designed as a semipassive yaw system, using the action of the wind on the turbine assembly as the primary force for orienting the blade assembly at the proper angle to the wind. This natural weathervaning effect is supplemented *560 by an electric yaw drive motor to assist in achieving the proper orientation when the turbine becomes misaligned by a large enough angle. Through repeated rotation of the wind turbine assembly in response to changing wind directions, the drop cable leading from the wind turbine to the grid connection on the ground may become twisted. The yaw drive motor can be used to counter rotate the wind turbine assembly to reverse the cable twist. The Dynergy 180 was designed to operate with a computerized controller manufactured by General Electric that would monitor and automatically regulate operating functions such as start-up at cut-in wind speed, shut-down in the event of malfunctions, and use of the yaw motor to maintain proper orientation of the wind turbine. Additionally, the controller monitors cable twisting due to rotation of the turbine and reverses such twisting by counter rotating the turbine with the yaw drive motor. The controller may also be used to monitor the wind turbine's power production and production efficiency. These functions are accomplished by the controller through continual monitoring of a variety of sensors on the wind turbine (including anemometers, weather *561 vanes, RPM meters, and vibration and heat sensors), and automatic actuation of appropriate mechanical elements such as the yaw drive motor, brakes, and the contactor between the generator and the electrical grid. In the opinion of respondent's expert witness, Robert E. Wilson, operation of the Dynergy 180 without a controller is inadvisable from the standpoint of both safety and efficiency. He deemed the use of a controller essential to the safe and profitable operation of the Dynergy 180 wind turbine. When the wind turbines were acquired, the partnership intended to operate them using controllers. However, no controllers had been installed on the partnership's wind turbines as of December 31, 1985, principally because the General Electric controllers designated by the designers of the Dynergy 180 were not available for installation on the partnership's wind turbine systems in December 1985. Additionally, Sandberg's representative, John Michael Davis (Mr. Davis), vice president and a principal shareholder in Sandberg, believed that the General Electric controller was overly complicated and advocated use of a type of controller produced by a Texas firm that was being used on wind *562 turbines in the windpark manufactured by a different company. The parties have referred to the controller advocated by Mr. Davis as the Carter controller, from the name of the company manufacturing the wind turbines upon which such controllers had been installed. It is not clear from the record whether Carter controllers were available for installation on the partnership's wind turbines in 1985, but, in any event, no controllers were installed at that time. 3. The Partnership's Acquisition of the Wind Turbines. Petitioner, Mr. Brink, and a number of petitioner's clients from her accounting firm were members of a partnership that invested in wind turbine generators in the San Gorgonio Pass in 1984. Because of that investment, Mr. Brink was approached in 1985 by Mr. Davis, on behalf of Sandberg, with the prospect of investing in the two wind turbines Sandberg had acquired from Dynergy. In response to that contact, 85 Gorgonio Wind Generating Co. was formed as a general partnership for the purpose of investing in the two wind turbine generators. In December 1985, the two Dynergy 180 turbines that had been conveyed to Sandberg by Dynergy were conveyed to the partnership pursuant *563 to a written contract executed by the partnership and Sandberg. The contract between Sandberg and the partnership specifies payment of the purchase price as follows: $ 390,000 in cash payable within 180 days of the contract date, and $ 390,000 to be represented by a promissory note payable to Sandberg. A portion of the purchase price, not to exceed $ 60,000, was to be rebated to the partnership by Sandberg at the rate of $ 7,800 per year, in exchange for petitioner's accounting and administrative services to the partnership. The partnership paid $ 330,000 to Sandberg by a series of checks dated between December 26, 1985, and May 28, 1986. No promissory note was produced by the partnership, and Mr. Brink acknowledged in his testimony that "we may not have generated the note ever." In the partnership books and on the tax returns, the partnership stated that the cost basis of the two wind turbines was $ 780,000. In connection with the acquisition of the two wind turbines, the partnership entered into a separate agreement with Sandberg, whereby Sandberg granted the partnership an easement to use the sites in the windpark upon which the partnership's two wind turbines were installed. *564 That agreement also provided that Sandberg would operate the turbines on the partnership's behalf and sell electricity produced by the partnership's wind turbines to Southern California Electric, pursuant to Sandberg's contract with the utility. The partnership agreed to pay Sandberg 9.5 percent of its revenue for the easement (increased to 14.5 percent on January 1, 1991) and 2 percent of its revenue for operation and management. Sandberg delegated its obligation to operate and maintain the partnership's wind turbines under the agreement first to Dynergy, and then to Sumitomo. Under wind conditions typical of those in the windpark, the Dynergy 180 operating at the anticipated 95-percent availability (100 percent of rated power) would theoretically produce an annual average of 490,000 kilowatts of electricity. At a sale price of $ .0695 per kilowatt in 1986, the expected revenue from the sale of electricity produced by each Dynergy 180 wind turbine generator was $ 34,059. As the sales prices for electricity increased through 1994 (the last year purchase prices under the Southern California Edison power purchase contract were to be set under a non-avoided cost method), the expected *565 revenue to be produced by each Dynergy 180 wind turbine increased annually to a projected $ 62,466 in 1994. [2]
In the event the wind turbines were not in operating condition and producing electricity at the predicted level of availability due to Sandberg's failure to make repairs, Sandberg agreed *566 to pay the partnership an amount equal to the amount that would have been realized from the sale of electricity had the wind turbines been operational (the alternate payment). The alternate payment was to be calculated on the per kilowatt hour price to be paid Sandberg under the Southern California Edison contract, using the actual windspeed data for the period when the wind turbine was inoperable, multiplied by the turbine's power curve. [3]
Condition of the Partnership's Wind Turbines on December 31, 1985. When acquired by the partnership from Sandberg in December 1985, the two Dynergy 180 wind turbines were already on location in the windpark on row F1, at spaces designated "F1-6" and "F1-7". [4] The partnership's wind turbine drivetrains were mounted on towers and connected to the grid as of December *567 31, 1985. The wind turbines were fitted with helicopter blades significantly shorter than the 31.5-foot Livesay blades called for in the design specifications. Neither wind turbine was equipped with a controller and no gauges or other devices had been installed in the blockhouse for ground-level monitoring of the wind turbines' sensors as of December 31, 1985. In this condition, the wind turbines were capable of generating electricity under favorable wind conditions through manual operation; however, lack of instrumentation in the blockhouse prevented continuous ground-level monitoring of the wind turbines' sensors in an efficient manner. *568 Operation of the Partnership's Wind Turbines. Neither of the partnership's wind turbines produced electricity in 1985. [5] A fully automated General Electric controller was installed on the partnership's wind turbine on space F1-6 in May 1986, and that wind turbine produced 92,454 kilowatts of electricity during 1986. The partnership's wind turbine located on space F1-7 was not operated with a controller in 1986, and there is no evidence that electricity was produced by the partnership's wind turbine on space F1-7 in 1986 or later years. The record reflects that the turbine on space F1-6 was shut down sometime in 1986 due to mechanical failure and was not operational thereafter. The wind turbine located on space F1-7 was removed from the windpark sometime in 1986 by Sumitomo, together with turbine equipment owned by other parties, due to a dispute between Sumitomo *569 and Dynergy relating to Dynergy's acquisition of the wind turbine from Sumitomo. The Partnership's Tax Treatment of the Wind Turbine Transactions. The partnership reported income from Sandberg's rebate for petitioner's services in the amount of $ 7,800 in 1985. In 1986, the partnership reported gross receipts from Sandberg's alternate payment in the amounts of $ 66,000 and the rebate in the amount of $ 7,800. Sandberg filed a petition in bankruptcy under Chapter 11 in February 1987, and a trustee was appointed in 1988. Thereafter, the partnership did not obtain information concerning the amount of electricity produced by the wind turbines, if any. However, the partnership continued to report income based on the Sandberg alternate payment for 1986 and subsequent years. When actual windspeed data was unavailable, the partnership calculated the alternate payment amount using an average of the reported wind conditions during prior years. The partnership treated such income as having been offset against the payments on the partnership's acquisition indebtedness by Sandberg. According to the partnership tax returns, the partnership's cost basis of the two wind turbines was *570 $ 780,000. The partnership claimed depreciation deductions, a 10-percent investment tax credit, and a 15-percent business energy credit with respect to the wind turbines. In 1985, the partnership reported a loss in the amount of $ 68,655.73. In 1986, the partnership's reported loss was $ 103,601.09. ULTIMATE FINDINGS OF FACT The partnership acquired wind turbine generators located on windpark spaces F1-6 and F1-7, pursuant to a contract binding on December 31, 1985, for the purpose of producing electricity for sale to a utility. The partnership's transactions with respect to the wind turbines had economic substance and were entered into with a bona fide profit motive. Neither wind turbine acquired by the partnership was capable of regular, ongoing operation for the production of electricity during 1985. The partnership's wind turbine located on space F1-6 was capable of regular production of electricity as of May 1986, and was used for that purpose in 1986. The partnership's wind turbine located on space F1-7 was not placed in a condition or state of readiness and availability for the ongoing production of electricity during 1986. OPINION Respondent's adjustments disallow *571 the partnership's depreciation deductions and investment and business energy tax credits claimed for 1985 and 1986. Respondent contends that the partnership's investment in the wind turbines was devoid of economic substance and entered into without the requisite profit motive. Respondent also argues that the wind turbines were never placed in service. [6] Petitioner argues that the wind turbines were placed in service in December 1985. Economic Substance and Profit Motive. Respondent first contends that the partnership is not entitled to deductions or credits because the investment in the wind turbines *572 was a sham, lacked economic substance, and was not undertaken with the requisite profit motive. The Court of Appeals for the Ninth Circuit, in Casebeer v. Commissioner, 909 F.2d 1360, 1363 (9th Cir. 1990), affg. T.C. Memo. 1987-628, affg. Sturm v. Commissioner, T.C. Memo. 1987-625, affg. Moore v. Commissioner, T.C. Memo. 1987-626, and affg. in part revg. in part Larsen v. Commissioner, 89 T.C. 1229 (1987), held that the determination of whether a transaction is a sham is a two-part test: (1) Whether the taxpayer has shown a business purpose for engaging in the transaction other than tax avoidance; and (2) whether the taxpayer has shown that the transaction had economic substance beyond the creation of tax benefits. The application of the "business purpose" prong is a subjective test, whereas the application of the "economic substance" prong is an objective test. Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. Brown v. Commissioner, 85 T.C. 968 (1985). *573 However, the analysis need not follow a rigid two-step pattern. Instead, the consideration of business purpose and economic substance are simply more precise factors to consider in the application of this court's traditional sham analysis; that is, whether the transaction had any practical economic effects other than the creation of income tax losses. * * * [Id.]
Respondent's argument on this issue encompasses three elements: (1) That the investment was a sham or "paper" transaction; (2) that the partnership failed to research and conduct its transactions in a businesslike fashion; and (3) that there was little true opportunity for profit. We have considered respondent's arguments on each of these points, and considering all the facts and circumstances, we conclude that the investment was not a sham. The wind turbines acquired by the partnership existed, and in the case of one of the turbines, produced a significant amount of electricity in 1986. The parties stipulated that had the wind turbines operated at rated capacity with 95-percent availability, as anticipated, each wind turbine would have produced an annual average of 490,000 kilowatts of electricity. The *574 partnership was entitled to sell the electricity produced by the wind turbines to Southern California Edison under the contract between the utility and Sandberg. Even with less than optimum performance, there was a realistic possibility of profit from operation of the wind turbines. Sandberg's bankruptcy in early 1987 adversely affected the operation of the partnership's wind turbines for the following years, but on the basis of information available when the wind turbines were acquired in 1985, the partnership realistically could have determined that the investment would be profitable. We hold that the transactions had economic substance and that the partnership entered into the investment with a business purpose and a bona fide profit motive. Placed in Service. We turn next to the issue of whether the wind turbines were placed in service in 1985 or 1986. Determination of when equipment has been placed in service for purposes of depreciation deductions, investment tax credits, and business energy tax credits is governed by sections 38(a), 46(a)(1) and (2), (b)(1) and (2), (c)(1), and 167(a), and sections 1.46-3(a)(1), (d)(1) and (2), 1.167(a)-10(b), and 1.167(a)-11(e)(1)(i), *575 Income Tax Regs. These code sections and regulations define the time when equipment is placed in service as the time when it is "placed in a condition or state of readiness and availability for a specifically assigned function, whether in a trade or business, in the production of income, in a tax-exempt activity, or in a personal activity." Secs. 1.46-3(d)(1)(ii), 1.167(a)-11(e)(1)(i), Income Tax Regs.
Petitioner argues that since the wind turbines were fully constructed as of December 31, 1985, and were capable of producing electricity on that date had the windspeed been sufficient, they should be considered placed in service in 1985. Respondent counters that due to the lack of electronic controllers and the installation of helicopter blades shorter than the 31.5-foot Livesay blades specified for use on the Dynergy 180, the partnership's wind turbines were not in a state of readiness for regular use in the production of electricity. In deciding when the wind turbines were placed in service, we must determine when they were "placed in a condition or state of readiness and availability" for their specifically assigned function. Respondent relies on Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), *576 and Sealy Power, Ltd. v. Commissioner, T.C. Memo. 1992-168, for the proposition that the partnership's wind turbines were not placed in service because they were not capable of regularly producing electricity in either 1985 or 1986. Consumers Power Co. v. Commissioner, supra, involved a hydroelectric plant that did not begin producing electric power on the basis originally envisioned until the year after the plant had been constructed. The plant was not deemed to be placed in service until demonstrating that it was available for service on a regular basis. In Sealy Power, Ltd. v. Commissioner, supra, we held that a solid waste electrical power production facility could be considered placed in service only after the facility was complete and working on a regular basis. Similarly, in Noell v. Commissioner, 66 T.C. 718, 728-729 (1976), an airport runway was held to have not been placed in service until it was paved, even though planes had begun to use the runway at an earlier stage of construction of the facility when the runway had only a rock surface. *577 Our holding in Noell v. Commissioner, supra, turned on the conclusion that the runway was not in a state of availability for the specific intended function in the taxpayer's trade or business when it lacked a surface that could be used on a permanent basis. In Valley Natural Fuels v. Commissioner, T.C. Memo. 1991-341, affd. without published opinion 990 F.2d 1266 (9th Cir. 1993), we held that an ethanol distillation facility with an assigned function of producing 198.2 proof ethanol was not placed in service until all parts necessary to enable the facility to produce ethanol at that proof were installed. Thus, the facility was not placed in service when it was first operated because it was capable of producing only ethanol of less than 198.2 proof quality at that time. As we stated in Valley Natural Fuels v. Commissioner, supra: The cited regulation does not require that property be free of all flaws and defects as of the time that it is first operated; ultimately, however, the property must be operating in the fulfillment of its specifically assigned *578 function. See Noell v. Commissioner, 66 T.C. 718, 728-729 (1976).
Operation of the Dynergy 180 wind turbines without controllers was theoretically possible, at least for short periods of time, but would be less cost effective and potentially more hazardous than operation with the automatic controllers designed for use on the wind turbines. The partnership purchased the wind turbines intending to use automatic controllers in their regular operation, and petitioner has not shown that either of the partnership's wind turbines were ever operated to produce electricity without a controller. Further, the necessary groundlevel gauges to operate the wind turbines manually in an efficient manner were not installed. Based on all of the evidence, we conclude that it is unlikely that the partnership's wind turbines could have been operated on a regular, ongoing basis for the production of electricity without electronic controllers. Further, installation of the shorter helicopter blades rather than the designated Livesay blades significantly reduced the production capability of the wind turbines in 1985. In sum, the partnership's two wind turbines were *579 simply not available for production of electricity on a regular, ongoing basis in the condition in which they existed in 1985. Since neither of the partnership's wind turbine generators were available for full service on or before December 31, 1985, we hold that they were not placed in service in that year. Accordingly, respondent's determination that the partnership is not entitled to depreciation deductions and investment and business energy credits in 1985 is sustained. A controller was installed on the partnership's wind turbine located on space F1-6 in May 1986, and the wind turbine was operated and produced electricity in that year. We hold that the partnership's wind turbine located on space F1-6 was placed in service in 1986. Petitioner has not shown that a controller was installed on the wind turbine located on space F1-7 in 1986, and there is no evidence that electricity was ever produced by that wind turbine in 1986. Therefore, we hold that the partnership's wind turbine located on space F1-7 was not placed in service in 1986. The partnership is therefore entitled to a depreciation deduction in 1986 for only one of the wind turbines. The 15-percent business energy *580 tax credit for wind property expired on December 31, 1985, and is not available for property placed in service after that date. Sec. 46(b)(2)(A) and (B). Since we have found that the partnership's wind turbines were not placed in service on or before December 31, 1985, the partnership is not entitled to business energy tax credits for the wind turbine placed in service during 1986. Respondent's determination on this issue is therefore sustained. The Tax Reform Act of 1986 generally repealed the investment tax credit for property placed in service after December 31, 1985. Sec. 49(a). However, section 49(b) provides an exception for "transition property", as defined in section 49(e), including property that was acquired by the taxpayer pursuant to a written contract binding on December 31, 1985. The partnership's wind turbines were acquired pursuant to a written contract binding on December 31, 1985. Accordingly, the partnership is entitled to the regular 10-percent investment tax credit with respect to the wind turbine placed in service in 1986 (the turbine located on space F1-6). However, the partnership failed to show that the other wind turbine (located on space F1-7) was *581 placed in service in 1986, and therefore is not entitled to the investment tax credit with respect to that property. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. This estimation is based upon a projection included in a report by AeroVironment, Inc., which the parties stipulated as a joint exhibit. The partnership projected energy revenue of $ 118,609.40 for both wind turbines in 1994, or $ 59,304.70 per turbine. The difference appears to be that the partnership's calculations apply the 95-percent availability factor to the average energy output projection of 490,000 kWh per turbine. The AeroVironment report factors in the projected 95-percent availability in arriving at the 490,000 kWh figure. In other words, the partnership applied the 95-percent factor twice in its calculations, and therefore understated the revenue estimates in comparison with the AeroVironment estimates.↩
3. The wind turbine's power curve is the theoretical computation of the turbine's electrical production capacity under increasing windspeed, taking into account the generator capacity, blade design, and swept area.↩
4. The first space on row F1, space F1-1, was not fitted with a wind turbine because of the close proximity of a road. Four Dynergy 180 wind turbines owned by Mesquite Wind Partners, a partnership unrelated to 85 Gorgonio Wind Generating Co., were located on each of the spaces F1-2, F1-3, F1-4, and F1-5. Thus, the sites where the partnership's wind turbines were installed were the 6th and 7th spaces on row F1. An additional 8 or 9 Dynergy 180 wind turbines owned by unrelated parties were assigned to the remaining spaces on row F1.↩
5. The parties stipulated that production of electricity by the partnership's wind turbines was impeded by seasonable low wind during December 1985.↩
6. In the notice of final partnership administrative adjustment, respondent cited the "at risk" limitations of sec. 465 as an additional ground for disallowance; however, that issue has not been discussed by the parties in their briefs, and we consider respondent to have conceded it. We note that the cash invested by the partnership in 1985 and 1986 exceeds the adjustments proposed by respondent for those years.↩