T.C. Memo. 2013-275

UNITED STATES TAX COURT

MICHAEL D. BROWN AND MARY M. BROWN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   1097-07, 2360-07,          Filed December 3, 2013.
                   649-08,   721-09,
              31012-09, 5108-11.


<u>Michael Charles Cohen</u>, <u>Jonathan I. Reich</u>, <u>Judianne J. Jaffe</u>, <u>Russell M.</u>

<u>Ozawa</u>, and <u>David L. Rice</u>, for petitioners.

<u>Louis B. Jack</u> and <u>Jeri L. Acromite</u>, for respondent.

**[*2]**         MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  On December 30, 2003, an insurance salesman named Michael Brown[1] took ownership of a $22 million plane in Portland, Oregon.  He flew from there to Seattle to Chicago--he says for business meetings--and then back to Portland.  Brown says these flights put the plane in service in 2003, and entitle him to a giant bonus-depreciation allowance.  But a few days later he had the plane flown to a plant in Illinois where it underwent additional modifications that were completed about a month later.  The Commissioner says these additional modifications mean that Brown didn't place the plane in service until 2004.

We have to figure out what exactly it means to put a plane "in service."

FINDINGS OF FACT

I.      <u>Brown's Insurance Business</u>

Fitzgerald asserted that "the very rich * * * are different from you and me." F. Scott Fitzgerald, "The Rich Boy", *in* All the Sad Young Men 1, 5 (1926). Hemingway replied that "[t]he very rich are different from you and me. * * * [T]hey have more money."  Ernest Hemingway, "The Snows of Kilimanjaro", *in* The Fifth Column and the First Forty-Nine Stories 58, 78 (1938).  The facts of

---

[1] Mary Brown is a party only because she and her husband filed a joint return.  All references to Brown are to Michael Brown.

[*3] this case show that both statements are true: The very rich have much more money and they can use it to do things with insurance that most people can't.

Brown has built his career on figuring out how to help the very rich do these things. He finds what Fitzgerald called the "compensations and refuges of life," Fitzgerald, supra, at 5--or at least of life insurance--for them to use in their estate planning. And he's been very successful--he doesn't bother selling policies worth less than $10 million, and has sold a handful in the range of $300 million. On those larger ones, the premiums average between $10 and $15 million per year. Since Brown's commission on a policy often equals the first year's premium, he's earned over $10 million on a single policy several times--and once even earned $17 million on a single deal.

As one might imagine, individuals with the means to buy these policies are not common, and Brown has to constantly prospect for new clients. Most of these he gets through referrals, and most of his referrals come from a network of CPAs and other insurance agents he has nurtured for years. When an agent or accountant in his network identified a Forbes 400 member pursuing an insurance program, that contact would often call Brown--an insurance genius often ahead of the IRS in his understanding of the Code's intricacies, or at least its apparent

[*4] intricacies[2]--to explain and sell the insurance.  If Brown closed the deal, he would share the commission with the one who brought him the lead.

II.    Need for an Aircraft

The very rich are also very demanding.  Early in his career Brown realized that relying on commercial flights to meet prospective clients at a moment's whim would limit his success, so he began to charter jets.  The ability to get to prospective clients quickly on their own schedules gave him a huge advantage over his competitors.  But eventually even chartering led to missed business opportunities.  Brown credibly testified that jet owners often reneged on their oral commitment to supply a plane and, as Brown said, "[i]f they decide to use it themselves, you're just out of luck."  He recounted one such missed opportunity: He had set up a meeting with the Koch brothers in Kansas and arranged for a charter from Orange County to Wichita.[3]  But when he arrived at the airport, the plane didn't show up and the charter company told him that the owner had decided

_____

[2] In 2002, a New York Times article credited him and a nationally known estate-planning attorney with inventing a split-dollar life-insurance arrangement that enabled Brown's clients to avoid $9 in estate taxes for every $1 of insurance they bought. Within a mere three weeks after the article's publication, the IRS issued Notice 2002-59, 2002-2 C.B. 481, which disallowed the arrangement's use.

[3] The Koch brothers are part of the family that control Koch Industries, an exceptionally large privately owned company.

**[*5]** to use it for himself. Brown couldn't fly commercially to Wichita to make the meeting, and the Kochs didn't reschedule. He later learned they ended up buying a policy from another agent that resulted in an $8 million commission.

That missed opportunity in 2001 persuaded Brown to buy a plane for himself. That plane was a Hawker jet managed by a company called PrivatAir-- and it helped Brown a good deal in meeting the needs of his upscale clientele. He could even occasionally travel to four different states on the same day to meet with prospective clients. Owning a plane also enabled him to establish a "certain rapport" with the "extreme high end of the insurance buyers," most of whom also owned their own jets. The Hawker, however, wasn't perfect. It was "only about a four[-]hour airplane," which meant that Brown couldn't fly nonstop from Los Angeles to New York--the two cities that he said had the most billionaires--unless he had a jet stream behind him. Without one, he had to stop in Kansas to refuel, which stretched a five-hour journey into a seven-hour one.

III.    The Search for an Upgrade

This inefficiency wore on Brown, and he decided to upgrade his ride. Recognizing the low interest rates prevalent in 2003 (compared to the 8% interest he was paying on the money he borrowed to buy the Hawker), he began to shop for a longer-range aircraft. His search intensified in May 2003 when Congress

[*6] increased bonus depreciation from 30% to 50% for certain kinds of property acquired and placed in service between May 6, 2003 and December 31, 2004. See Jobs and Growth Tax Relief Reconciliation Act of 2003 (JGTRRA), Pub. L. No. 108-27, sec. 201, 117 Stat. at 756.

Upon learning of that "big benefit"--and in combination with his "exceptionally good year"--Brown started his hunt for a better plane. But he insisted that whatever was offered to him be available for delivery in 2003. After unsuccessfully trying to buy an airplane on his own, Brown called Woody McClendon. McClendon was working for a company named Private Jet Services, Inc., but Brown had known him since his days at PrivatAir, the plane-management company that Brown had used for years. McClendon directed Brown to a Bombardier Challenger 604. And McClendon told him that the Challenger would be available for delivery by the end of 2003--an absolute must for Brown whose income, and thus whose ability to use very large depreciation allowances, could vary greatly from year to year.

Brown quickly took off after this lead. He promised a $200,000 commission to Private Jet Services, and McClendon flew to Cahokia, Illinois, to inspect the jet--then owned by a company called Jetcraft--to ensure a December delivery. The jet was in Cahokia at the Midcoast Aviation Facility, a plant where

**[*7]** owners could have their jets configured and equipped to their specifications. (Jetcraft had a contract with Midcoast to configure jets that Jetcraft had bought on speculation.) After confirming that the Challenger would be ready for a December 2003 delivery, McClendon put Brown in touch with Jetcraft and they began to bolt together a deal. In early December 2003, Brown himself traveled to Cahokia to check Midcoast's progress, and took a test flight on a similar Challenger jet that Midcoast had already finished work on.

Brown liked what he saw and so, on December 16, 2003, he signed a contract to buy the Challenger for $22 million. He made sure that the contract required delivery in Oregon by December 31, 2003;[4] and if Jetcraft failed to do so, the contract let Brown terminate the deal and receive a full refund of his entire deposit. Brown made no secret to Jetcraft and Midcoast that he needed to close by that date for tax reasons.

IV.    Postcontract Modifications

The $22 million Brown promised to pay was not the entire purchase price. While Brown was in Cahokia, Midcoast showed him some other planes, and one in particular caught his eye. It had a conference table, in just about the same spot

---

[4] Brown wanted the plane delivered to him in Oregon because that state, unlike California, has no sales tax.

**[*8]** where Brown's plane had two barcaloungers. Brown was inspired--he "didn't want just comfort" from the jet, he "wanted to use it for business." The conference table was now a necessity.

McClendon tried to dissuade Brown. He advised him that adding a conference table was not a good idea, and not just because of its cost and weight. As McClendon put it, "it was a big job," requiring a major rework of the airplane, including rebuilding the floor and installing a separate subhydraulic system.[5] But because McClendon said that Brown told him that he "needed it for his mission," Brown insisted that his plane have a conference table.

Brown also wanted another change to the interior. He frequently used PowerPoint to make presentations to potential clients or fellow insurance agents.

---

[5] Adding a conference table would also increase the plane's seating capacity, and more seats meant that federal regulations would require the installation of a digital flight-data recorder. The Commissioner focuses on the fact that the flight-data recorder installation was necessary only because Brown wanted to use the aircraft in a charter business in addition to his insurance business. And because this modification was not made until 2004, the Commissioner argues that Brown could not have placed the Challenger in service in 2003. Brown argues that--even though he did sign a charter agreement for the Challenger beginning January 1, 2004--he hadn't decided in 2003 whether to charter it. Brown also credibly testified that chartering is used only "to defray some of the cost, but it's not a business that will make enough money to pay for the airplane." We make no finding as to whether Brown intended to have a charter business in 2003, and therefore we need not--and will not--decide whether the lack of a digital flight recorder in 2003 prevented Brown from placing the Challenger in service that year.

**[*9]** This was important to the effectiveness of his sales pitch, so he wanted Midcoast to replace the standard 17-inch display screens with 20-inch screens. These seemingly minor touches about adding the conference table and upgrading display screens were important to Brown's business, and we find his testimony credible when he stated that "[he] *needed* those two things done" for his business.

Midcoast hesitated to comply with these demands before delivering the plane. According to Brown, these modifications were "too specific" and Midcoast didn't "like to make super specific adjustments until you've already bought the airplane." We find, however, that there was a reason *Brown* didn't want the changes made until after he took ownership of the plane: Midcoast estimated that these modifications--along with a few other requested customizations--would take at least six weeks. And that would prevent Brown from taking delivery in 2003.

So Brown and Midcoast agreed on an alternative. On December 23, 2003-- one week after Brown signed the contract to buy the plane--Midcoast sent him a revised form, called an Aircraft Work Authorization, to reconfigure the Challenger to include, among other things, the conference table and the larger display screens. The proposal quoted a price for those modifications--along with a few others--of

[*10] more than $500,000.[6] The following day Brown agreed to Midcoast's proposal and paid an immediate 10% nonrefundable deposit.[7] When Midcoast received it five days later on December 29, 2003 (the delay allegedly due to a fax-machine error), McClendon confirmed with a Midcoast representative that--after Brown took delivery of the airplane before the end of the year--the plane would return to Midcoast on January 5 or 6 to start the work.

## V.    Delivery

Brown and his family planned a vacation at the end of the year, but he didn't get much rest during those last few days of 2003. Although the parties had first planned to transfer the Challenger on December 23, 2003, delays started to creep in, and they rescheduled delivery for December 29 in Portland. Brown had his personal pilot, Rick Duggan, fly him in his old plane from Cabo San Lucas,

---

[6] Specifically, Midcoast estimated the installation of the conference table would cost $220,000 and the display screen upgrade $20,000. (The other high-dollar item in that proposal was the installation of a laser inertial-reference system estimated to cost $225,000.) The proposal didn't even include the installation of a digital flight recorder, which ended up costing yet another $200,000.

[7] The paperwork shows that Brown signed this authorization on behalf of Zulu Equipment, LLC. Brown formed this company for the sole purpose of buying and owning the Challenger. Because Zulu is a single-member LLC that didn't elect to be treated as a corporation, we disregard it as an entity separate from Brown for tax purposes. See sec. 301.7701-2(c), Proced. & Admin. Regs. (Jet owners apparently park ownership of their planes in LLCs to limit their liability if something goes terribly wrong.)

[*11] Mexico--where Brown had been at his vacation home with his family--to Chino, California (the old plane's home base).  Then Brown learned that there were problems with the loan he'd arranged to finance the deal.  This meant more delay.

On the morning of December 30, Brown and Duggan finally flew to Portland so Brown could take delivery of the Challenger.  Brown inspected the plane, and pronounced it "perfect for some buyers."  He explained that "[i]t was complete in every way except for two business requirements that [he] needed."  We find this testimony credible.  Brown reiterated that since he "wanted to use [the plane] for business," he "needed those two things done."  But, because of the deal he had cut to have that work done in January 2004, Brown signed the closing documents and accepted delivery of the Challenger.

Brown understood that taking delivery wasn't enough to capture the bonus depreciation he was hunting.  So his eventful day had only just begun.  In what the Commissioner calls "tax flights," Brown proceeded to take several trips in the Challenger.  After fueling the plane around noon,[8] a pilot certified to fly the

---

[8] See infra note 12 for discussion regarding the time discrepancy between the Portland fuel receipt Brown provided at trial and the flight logs.

[*12] Challenger flew Brown and Duggan[9] --along with Brown's aviation attorney, Mark Schneider[10]--from Portland to Seattle, landing just before 1 p.m. Brown testified that he flew there to have a business lunch with Michael Mastro, a real-estate developer to whom he had sold a large insurance policy earlier in the year, and a couple that Mastro wanted to introduce to him as potential clients.[11] Brown said that he met them at a restaurant named Carmine's for maybe an hour-and-a-half or two. He added that it "turned out like most of the meetings, they don't buy." In addition to his testimony, Brown introduced a letter dated December 31, 2003 that Mastro wrote and signed. That letter read:

> Dear Mike:
>
> I just wanted to thank you for taking the time to fly up here to Seattle and meet with me yesterday. As you know, it was critical that we

---

[9] Since Duggan hadn't received training specific to the Challenger--and thus was not "type rated" for that aircraft--he was not yet able to fly it himself.

[10] At trial Brown denied that Schneider was on board. Brown had, however, previously told the Commissioner in response to an informal discovery request that Schneider was on that flight "to review and discuss the purchase documents signed in Portland and related legal matters associated with managing and operating the aircraft." Brown didn't call Schneider to testify and didn't satisfactorily explain his earlier statement, which we now find more believable.

[11] Brown testified he couldn't remember the couple's name. And neither Mastro nor the unnamed couple testified at trial. (Mastro's absence was easy to explain since, according to the parties, he was a fugitive from money-laundering and fraud charges at the time of trial.)

[*13] meet before yearend to review the insurance policies that you sold me earlier this year and discuss future opportunities.

Because of your extraordinary knowledge of insurance and related matters, I was happy to introduce you to a business associate of mine and his wife. I enjoyed watching their eyes light up as you discussed how you could help them take advantage of various estate planning alternatives. I trust you will be able to turn this introduction into a win-win situation for both parties.

Again, thanks for all you have done for me and my family in the past and I look forward to working with you in the future

Best regards,

/s/ Michael Mastro
Michael Mastro

Not only do our eyes not light up, but we sense something doesn't smell quite right with the whole Seattle visit. First, Brown's testimony didn't jibe with the flight logs he submitted at audit. Although Brown said his lunch meeting lasted between 90 minutes and two hours, the flight logs show that the Challenger was on the ground in Seattle for only 66 minutes. With respect to the timeframe, we find the flights logs submitted at audit more credible than Brown's testimony.[12]

---

[12] Brown introduced new records--a summary flight log and three gasoline receipts--at trial that he hadn't previously given to the Commissioner. These records, however, not only contradict the original flight log that he had previously turned over to the Commissioner but also aren't consistent with each other. For example, the new summary flight log (like the one he provided at audit) shows the Challenger taking off at 11:50 a.m. local time in Portland, but one of the new--

(continued...)

**[*14]** We also give zero credence to the letter. Brown acknowledged that the letter was neither contemporaneous nor even prepared by Mastro. He admitted his CFO/CPA, Gary Fitzgerald, drafted the letter sometime much later and had Mastro sign it. Although at one point Brown said he thought he had told Fitzgerald to write the letter "several months" after year end, we find more credible his later testimony that one of Fitzgerald's jobs is to write letters on behalf of Brown's business associates "to get the substantiation for deductions *when the IRS requests them.*" (Emphasis added.) We therefore find that Fitzgerald didn't write this letter until at least 2006 when the IRS began auditing Brown's return for the 2003 tax year. We do not take it seriously as proof of anything but a reason to question Brown's credibility.

And that leaves us with only Brown's uncorroborated testimony about his lunch in Seattle. Brown didn't produce a lunch bill, and neither Mastro nor the

---

[12](...continued)
signed--fuel receipts introduced at trial shows the Challenger being fueled in Portland almost a half hour later. The new--unsigned--Seattle fuel receipt also indicates that Brown spent almost four hours in Seattle--about double the time that Brown himself said he was there. If Brown had been in Seattle for that long, the Challenger couldn't have landed at its next destination (Chicago) before 10 p.m. local time--which is over an hour later than the Chicago fuel-service receipt provided at trial indicates. We therefore don't give any weight to the unsigned Seattle fuel receipt or to the new summary flight log to the extent that it conflicts with what Brown originally provided.

[*15] unknown couple testified on his behalf.  We also find noteworthy that Schneider--who was on board the Challenger from Portland to Seattle (but not on any of the other flights discussed below)--worked at a law firm just outside of Seattle.  We therefore find it more likely than not that there was no business lunch in Seattle.

Brown, however, was not finished.  Sometime between 1 and 2 p.m. local time, Duggan and Brown flew the Challenger to Chicago, landing about three-and-a-half hours later at Midway airport.  Brown flew there for the sole purpose of meeting a fellow insurance agent named Marc Pasquale.

There is no doubt that Brown was Pasquale's mentor.  In the late '90s Pasquale--then only in his midtwenties--was a disillusioned CPA working for a giant accounting firm.  In 1998 his father, also a CPA, suggested to him that he meet Brown.  Pasquale grudgingly complied, but Brown quickly won him over--and at a breakfast meeting in New York, Brown convinced him to leave public accounting and begin selling insurance.

From "day one" Brown helped establish Pasquale's insurance career.  Although Pasquale acknowledged that it "was kind of an odd arrangement" because Brown was in southern California while he was in Chicago, Pasquale followed Brown around the country to apprentice with him for nearly two years.

[*16] The two often shared insurance commissions, and Pasquale credibly testified that he made over a million dollars on the policies that he worked on with Brown between 2000 and 2003. During that time they spoke several times a week.

So after Brown got off the plane in Chicago, he met with Pasquale at an airport pizza restaurant. Although Brown at times suggested otherwise, we find-- as Pasquale testified--that Brown himself set this meeting up. The whole visit lasted about an hour--Brown gave Pasquale a tour of the plane for about 10 minutes and then had a quick dinner for the other 50 or so minutes.

 What exactly did they discuss? Brown introduced another letter, very similar to the one supposedly from Mastro. This  letter was signed by Pasquale, dated December 31, 2003, and looks like it's on Pasquale's company letterhead. It reads:

Dear Mike:

Thanks for coming through for me when I told you how vital it was for us to meet before the books are closed on 2003.

As we discussed yesterday in Chicago, due to my efforts, we were able to share insurance commissions on well over a million dollars of policies in 2003. The list we reviewed, of prospective clients in the greater Chicago area, should generate even greater commissions in 2004.

Our relationship has always been mutually rewarding in the past, and based on yesterday's meeting, looks like it will continue so well into the future.

**[\*17]** Thanks again.

       Sincerely,
       OAK VENTURE ADVISORS, LLC

       /s/ Marc A. Pasquale
       Marc A. Pasquale

This is just not believable. Brown admitted that Fitzgerald had written the letter at his direction--like the Mastro letter--and sent it to Pasquale to sign. (Pasquale confirmed he signed a letter that had been written for him.) Pasquale "couldn't recall" exactly when he received it, saying he thought it was at some point in 2004 but also that it was possible that it was given to him as late as 2006. In light of that testimony, and Brown's testimony that one of Fitzgerald's jobs was to get documentation for these events only "when the IRS requests [it]," we find--as we did with the Mastro letter--that Fitzgerald didn't send this letter to Pasquale until after the IRS began auditing Brown's return in 2006.

Now to the letter's contents. As even Pasquale admitted, this letter was "a little bit over the top." Pasquale said he couldn't stand by the letter's statement that he needed to meet with Brown before year end. But we do believe Pasquale's testimony that "any time spent with [Brown] face to face was valuable" to him. So, although Pasquale admitted that he neither wrote nor reviewed the letter, we

**[*18]** find that it was important for him in some general way to talk to Brown in person about business.

What did they discuss? Brown said that they talked about two mutual clients with whom they were having some difficulty. Pasquale couldn't remember any of those details, and we don't credit Brown's testimony. That said, Pasquale credibly testified that of the hundreds of conversations he had with Brown over the years, "[t]here was not one that didn't involve business in some way." Their whole business is selling policies, Pasquale explained, and all they did was "talk about who [they're] going to see, who's [their] prospects, what's worth following up with, what's not worth following up with, [and] how to coordinate schedules." We believe Pasquale when he said that "there's no doubt" they talked business that night.

The Challenger remained grounded at Midway for about an hour and a half before Brown and Duggan boarded it at about 9 p.m. Chicago time to return to Portland. They returned there a little before midnight local time, and all said, Brown logged nearly 4,000 miles during his flights that day. The following morning--New Year's Eve--Brown and Duggan got back into Brown's old plane and returned to Cabo San Lucas where Brown rejoined his family on vacation.

[*19]    The Challenger, however, stayed in Portland.  It needed to return to Midcoast so--in McClendon's words-- it could be "finish[ed] up."  On January 3, 2004, McClendon flew it from Portland to Arizona (where he lived).  The next day, he took it to Cabo San Lucas to retrieve Brown and his family, dropping them off in California.  A different pilot then flew the plane back to Midcoast in Cahokia to complete the modifications.  Work began on January 5 and lasted about three weeks.[13]  After a few additional days of working through an issue related to obtaining replacement insurance, the completed Challenger was finally ready to return to Brown on January 30.

VI.    The Audit

The Browns claimed almost $11.2 million of bonus depreciation on the Challenger as an expense for his insurance business on Brown's 2003 Schedule C, Profit or Loss from Business.  That deduction, however, was far from the only item on the Browns' returns over a number of years that started the Commissioner's radar beeping loudly.  Between 2006 and 2010, the Commissioner issued six notices of deficiency to the Browns--one for each year between 2001 and 2006--determining that they had underpaid their tax by over

---

[13] Although Midcoast initially estimated in late December that the modification would take six weeks, that estimate was reduced to four weeks after Brown subsequently decided not to have some woodwork done.

[*20] $30 million, not including penalties under sections 6662 and 6663 of approximately $10 million.[14] The Browns timely filed a petition for each of these years and we consolidated the cases.

About two weeks before a scheduled two-week trial in Los Angeles (the Browns were California residents when they filed their petitions), the parties still hadn't resolved many of the issues. According to the Commissioner's 76-page pretrial memo, Brown had failed to substantiate a litany of his expenses on Schedule C, claimed fraudulent consulting-fee deductions, used nominees to conceal ownership and control of entities from the IRS, and created many false documents in an attempt to support illegitimate deductions. In the week leading up to trial, however, the parties settled every issue except Brown's entitlement to bonus depreciation. We thus tried the case on the single issue of whether Brown was entitled to deduct over $11 million in bonus depreciation on the Challenger for 2003. (The parties later filed a stipulation of settled issues that adjusted the Browns' income upwards of over $50 million, approximately $10 million of which was "subject to an addition to tax" for fraud under section 6663, resulting in taxes and penalties of over $20 million.)

---

[14] All section references are to the Internal Revenue Code in effect at all relevant times, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*21]**                                              OPINION

The dispute here is over timing.  The Commissioner concedes that Brown

could properly claim bonus depreciation on the Challenger for 2004. The

Commissioner, however, asserts there are two independent barriers that prevent

Brown from claiming the deduction for 2003.  First, he contends that the

Challenger was not placed in service in 2003.  But even if it was, the

Commissioner argues that Brown still loses because he didn't substantiate

qualified business use for that year.  We begin with a few passes over the lush and

tangled landscape of bonus depreciation.

I.      Bonus Depreciation

We start with depreciation:  Since tax policy desires generally to match

income with the expenses of producing that income, see INDOPCO, Inc. v.

Commissioner, 503 U.S. 79, 84 (1992), the Code allows a deduction for the

exhaustion and wear and tear of property used in a trade or business, sec. 167(a).

This allows taxes to more closely reflect economic profit.  To determine the annual

wear-and-tear, the Code generally requires taxpayers to use the modified

accelerated cost recovery system (MACRS) set up in section 168.

Enacted as part of the Economic Recovery Tax Act of 1981, Pub. L. No. 97-

34, sec. 201(a), 95 Stat. At 203--and substantially amended by the Tax Reform Act

[*22] of 1986, Pub. L. No. 99-514, secs. 201, 203, 100 Stat. at 2121, 2143 (which

ushered in the MACRS regime)--section 168 has been tinkered with by Congress

so often over the years that it has become, even by the standards of the Code,

unusually complex.  The many layers of amendments to the section have been of

many different shapes and sizes, but they still often show some semblance of

connection to the section's original purpose--economic stimulation.

And this was true immediately after September 11, 2001.  Concerned

about the effects the terrorist attacks might have on the economy, Congress

enacted section 168(k).  That subsection granted a "special allowance" for certain

property acquired after September 10, 2001 and before January 1, 2005.  See Job

Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, sec. 101, 116

Stat. at 22.  In the case of "qualified property," the depreciation deduction under

section 167(a) "for the taxable year in which the property is *placed in service* shall

include an allowance equal to 30 percent of the adjusted basis of the qualified

property" in addition to depreciation otherwise allowable under MACRS.  Sec.

168(k)(1)(A) (emphasis added).  This special allowance became known

colloquially as bonus depreciation.

Less than two years later, Congress upped the bonus.  See JGTRRA

sec.201.  Under new paragraph (4) of subsection (k), Congress increased bonus

[*23] depreciation for "qualified property" acquired and "placed in service" after May 5, 2003 and before January 1, 2005 from 30% to 50%. Sec. 168(k)(4)(B). For Brown to properly claim bonus depreciation for 2003, the Challenger must thus have been both *qualified property* and qualified property that was acquired and *placed in service* that year.

II.    Qualified Property

What is "qualified property?" As relevant here, the Code defines "qualified property" as property with "a recovery period of 20 years or less." Sec. 168(k)(2)(A)(i)(I). Noncommercial airplanes have a recovery period of five years, see Rev. Proc. 87-56, 1987-2 C.B. 674, so the Challenger flies past that test with no problem.

There are, however, exceptions that can bring otherwise "qualified property" to ground. See sec. 168(k)(2)(C). One of those is if the property is subject to the alternative depreciation system under section 168(g).[15] Sec. 168(k)(2)(C)(i). And to determine whether section 168(g) applies to property, we must first apply section 280F(b)--a section that relates to "listed property" with limited business use. See sec. 168(k)(2)(C)(i)(II).

_____

[15] Section 168(g) requires the use of an alternative (and less favorable) depreciation system for five specified categories of property.

**[*24]**    Section 280F(b) sends us down another runway.  Under section 280F(b)(1), a taxpayer must use the alternative depreciation system under section 168(g) if "listed property" is not "predominantly used in a qualified business use" for a certain taxable year.  "Listed property" includes property that's used as a means of transportation, such as the Challenger.  <u>See</u> sec. 280F(d)(4)(A)(ii).  The term "predominantly used in a qualified business use" means that the listed property's "business use percentage" must exceed 50%.  Sec. 280F(b)(3).  And "business use percentage" means the percentage of use which is a "qualified business use."  Sec. 280F(d)(6)(A).  And generally, "qualified business use" is "*any* use in a trade or business of the taxpayer."[16]  Sec. 280F(d)(6)(B) (emphasis added).  Thus, if Brown proved that he "used" the Challenger in any way in his business in 2003 more than 50% of the time he flew it (i.e., if the majority of his flight miles on December 30 were used any way in his business), then the alternative depreciation system under section 168(g) wouldn't apply, and the

---

[16] An exception is that "qualified business use" doesn't include leasing property to a 5-percent owner or related person.  Sec. 280F(d)(6)(C)(i)(I).  Although Zulu Equipment leased the Challenger to Brown in 2003, it's disregarded as a separate entity for tax purposes because it's an LLC wholly owned by Brown.  <u>See</u> <u>supra</u> note 7.  Thus, the lease is also disregarded for tax purposes.  <u>See</u> sec. 301.7701-2(a), Proced. & Admin. Regs ("[I]f the entity is disregarded, its activities are treated in the same manner as a sole proprietorship, branch, or division of its owner").

**[\*25]** Challenger would be considered "qualified property" for bonus-depreciation purposes.[17]

III.    Placed in Service

That's a hard question to answer, and we think it makes sense to keep it on standby--and move to the question of whether Brown placed his new plane in service within the meaning of the regulations.

Remember that section 168(k) says that for qualified property, "the depreciation deduction provided by section 167(a) for the taxable year in which such property is *placed in service* shall" be eligible for 50% bonus depreciation. Sec. 168(k)(4)(A) (emphasis added).  The regulation says that "[p]roperty is first placed in service when first placed in a condition or state of readiness and availability for a *specifically assigned function*."  Sec. 1.167(a)-11(e)(1)(1), Income Tax Regs. (emphasis added).  So the question comes down to whether *in*

---

[17] We note again the standard is "any use in a trade or business," sec. 280F(d)(6)(B), which isn't the same as the "ordinary and necessary" standard generally required of business deductions under section 162.  We have also held that "[n]owhere in the language of section 168 is there a suggestion that availability of the depreciation deduction is dependent on the satisfaction of the requirements of section 162.  There simply is no requirement that the use of the depreciable property be 'ordinary' or 'necessary.'  The only requirement is that it be used in the taxpayer's trade or business."  Noyce v. Commissioner, 97 T.C. 670, 689-90 (1991).

[*26] *2003* the Challenger was "in a condition or state of readiness and availability" for the "specifically assigned function" for which Brown purchased it.

The Commissioner argues that the Challenger's specifically assigned function was to serve as an aircraft configured in the manner Brown deemed necessary for his insurance business. And that configuration included a conference table and enhanced display screens. The Commissioner says that since those two modifications weren't made until January 2004 the Challenger wasn't ready for its specifically assigned function until then.

Brown disagrees. And with neither Code nor regulation to guide us, we must navigate using only caselaw. The earliest case the Commissioner relies on is Noell v. Commissioner, 66 T.C. 718 (1976). The taxpayer in Noell built an airport runway between late 1965 and late 1968, which required him to grade the land, supply a rock base, lay down asphalt pavement, and plant sod. Id. at 721. After he laid down the rock base in 1967--but before he completed the project--pilots did occasionally use the runway to land and take off. The roughness of the incomplete surface however, made it unsatisfactory for permanent use, and available only in good weather. Id. The taxpayer wanted an investment credit for

[*27] the runway against his 1968 tax bill.[18]  The Commissioner argued, however,

that since airplanes began to use the runway in 1967, the taxpayer had placed it in

service--and thus had to take the credit--that year.  Id. at 728.

We rejected the Commissioner's position.  We said that the "runway was

not in a condition or state of readiness" in 1967 because the rock surface was

"clearly only a stage in the construction of the facility" and it "was quite

unsatisfactory and pilots risked damaging their aircraft by landing on it."  We also

said that "the rock surface could not be used on a permanent basis, since the

landing area easily could be ruined by the weather."  We therefore held that since

the facility wasn't available for full service until the runway was paved in 1968,

the taxpayer hadn't placed the landing facility in service in 1967.  Id. at 729.

The Commissioner makes a similar argument here.  He says the

configuration of the Challenger in 2003 was "clearly only a stage in the

construction" of the asset and that the delivery of the Challenger in Portland on

December 30 was "nothing more than an interruption in the completion of the

---

[18] The regulation defining "placed in service" for purposes of the investment tax credit is identical to the "placed in service" definition in the depreciation regulations.  Compare sec. 1.46-3(d)(1)(ii), Income Tax Regs., with sec. 1.167(a)-11(e)(1)(i), Income Tax Regs.; see generally Shirley v. Commissioner, T.C. Memo. 2004-188 (proper to use regulations of repealed section if new section nearly identical).

[*28] aircraft." While that characterization likely understates how much of the aircraft had been completed by the end of 2003, we do agree with the Commissioner that Noell is relevant here. That is so because in 2003 the plane, like the runway in Noell, was "simply not available for full service" for its intended function--serving Brown's air transportation needs in his insurance business. See id. at 728. And until an asset is available for full service, it hasn't been placed in service. See id.

Brown disagrees, and argues that his plane was "fully functional for air transportation" and that, unlike planes landing on the runway described in Noell, his plane neither suffered nor threatened "safety hazards from its use or weather limitations when placed in service in 2003." The 2004 modifications, Brown says, "merely provided enhancing features that did not involve improvements necessary to allow the Challenger to serve its specific function of providing air transportation in connection with Brown's insurance business."

We agree with Brown that the Challenger "was fully functional for air transportation." But that's not quite the right question. The regulation tells us to decide when the plane was ready and available for a "specifically assigned function." Sec. 1.167(a)-11(e)(1)(1), Income Tax Regs.

**[\*29]**    What exactly was the specifically assigned function of Brown's new plane?  Brown asserts in his brief that the 2004 modifications were merely "enhancing features" which implies that the specifically assigned function was simply to fly Brown to and from meetings with his clients or leads.  But this would contradict his testimony.  According to that testimony, his insurance business *required* that the airplane have a conference table and the larger screens so he could make his Power Point presentations to clients and other agents--and those presentations were not a peripheral part of his business.  Without those two requirements, the Challenger wasn't fully functional for the very specific needs of Brown's insurance business.

The Commissioner cites two other cases that point us in the same direction-- Consumers Power Co. v. Commissioner, 89 T.C. 710 (1987), and Valley Natural Fuels v. Commissioner, T.C. Memo. 1991-341, 1991 Tax Ct. Memo. LEXIS 390, aff'd without published opinion, 990 F.2d 1266 (9th Cir. 1993).  We'll start with Consumers Power.  There, an electric utility began construction of a hydroelectric plant in 1969.  Id. at 716.  Regulators approved the utility's request to begin operating the plant, subject to successful completion of preoperational testing on a particular unit.  Id. at 717.  That unit--Unit 1--began pumping water and for about a two-week period in late November and early December 1972 generated electrical

**[*30]** power, substantially all of which was sold to the taxpayer's customers. Id. at 718-19. On December 7, however, a disruption in the unit's electrical power caused damage that led to a temporary shutdown for repairs. Id. at 719. Preoperational testing didn't resume until early in 1973. Id.

The taxpayer claimed a depreciation deduction on the plant for 1972, but the Commissioner determined the plant wasn't placed in service that year and thus disallowed the deduction. Id. We agreed with the Commissioner, finding that Unit 1 was not available to provide electrical power on a regular basis in 1972 and that the amount of electrical power generated that year wasn't sufficient to establish that the plant was available for "*full operation* on a *regular* basis." Id. at 725 (emphasis added). We found instead that the plant wasn't available for use until it had completed all preoperational testing in January 1973. Only after the unit had demonstrated that "it was *available for service on a regular basis* was the unit in a state of readiness and availability for its specifically assigned function." Id. (emphasis added).

The analogy to this case is close. Just as Unit 1 actually pumped water and generated electrical power that was sold to customers in late 1972, so did Brown actually fly in the Challenger halfway across the country in late 2003 to talk business (with at least one of the people he said he did). But the fact that a

**[*31]** taxpayer *uses* an asset in his business sometime during the course of a year doesn't necessarily mean that he *placed it in service* that year. Consumers Power tells us instead that the asset needs to be available on a regular basis for its specifically assigned function. And like the unit in Consumers Power that suffered an interruption in its use after it had generated electricity, the Challenger, after Brown flew in it one day in 2003, was grounded for three weeks at the beginning of 2004 so Midcoast could make the modifications that Brown required for his new plane to serve him on a regular basis for its specifically assigned function--not just moving Brown across country but enabling him to make his pitches on big screens to executives sitting at a conference table and not sprawled out in a lounge chair.

Brown would have us distinguish Consumers Power "on the simple grounds that the Challenger had already completed and passed flight testing, was flightworthy, and licensed for flight when" Brown used it "for the regular service of air transportation in 2003." This might be a good argument if precedent focused, for example, on an asset's having cleared any regulatory hurdles it needed to clear. But there are a great many depreciable assets which, unlike power plants and jet aircraft, don't have these sorts of regulatory obstacles. For these assets--and here we make the test a generally useful one--as well as assets

**[\*32]** like power plants and planes, our caselaw tells us to look at whether the asset involved is ready and available for full operation on a regular basis for its *specifically assigned function*. See id. at 724. Brown himself testified that the Challenger--as it was on December 30, 2003--wasn't sufficient to meet his specific business needs because the big screens and the conference table weren't yet installed.

We turn next to Valley Natural Fuels. That case arose from a partnership's acquisition of an ethanol-distillation plant. Since the partnership's objective was to produce and sell anhydrous ethanol (198.2+ proof ethyl alcohol), it bought the facility on an understanding that the plant could produce at least 1,500 gallons of 199+ proof ethanol per day. Valley Natural Fuels, 1991 Tax Ct. Memo. LEXIS 390, at \*18. The plant began operations in December 1983, but couldn't at first produce 198.2-proof ethanol without a molecular sieve, and actual ethanol production was less than 1,500 gallons per day. Id. at \*5. The partnership didn't have the molecular sieve installed until spring 1984 (and the plant needed still more equipment installed in 1985 to make it run properly.) Id. On its 1983 return, however, the partnership claimed a depreciation deduction on the ethanol-distribution equipment. Id. at \*9. The Commissioner argued that the plant wasn't

**[\*33]** placed in service or in a state of readiness to be placed in service by the end of that year. Id. at \*11.

We sided with the Commissioner. We ultimately found that the "assigned function of the facility was to produce and sell 198.2 proof ethanol," and concluded that the "facility was not in a condition or state of readiness and availability for its assigned function" in 1983. Id. at \*11-\*12. We rejected the partnership's argument that it "was improper to assume that the taxpayer's business objective must automatically equate to the assigned function of the taxpayer's equipment." Id. at \*18-\*19. We also rejected its argument that Consumers Power was distinguishable because the partnership in Valley Natural Fuels formally accepted the facility in 1983 whereas the taxpayer in Consumers Power didn't formally accept the plant until a year later than the one at issue. Id. at \*23. We pointed out that this distinction was likely not "a fair characterization of the facts," but in any event that alleged difference was "not dispositive." Id. Instead, the dispositive question was whether the plant "'was available for service on a regular basis' and hence in a state of readiness and availability for its specifically assigned function." Id. (quoting Consumers Power, 98 T.C. at 724).

While we acknowledged that the regulation doesn't "require that property be free of all flaws and defects as of the time that it is first operated," we

[*34] ultimately said "the property must be operating in the fulfillment of its specifically assigned function." Id. at *24 (citing Noell, 66 T.C. at 728-29). Because the facility wasn't capable of performing its specifically assigned function--the production of 198.2 proof ethanol--in 1983, we concluded that it wasn't placed in service that year. Id. at *26. Rather, "only after all of the[] component assets were installed and functioning [in 1985] did the facility constitute a complete unit that was operational and served the purpose intended by" the partnership. Id. at *26.

We agree with the Commissioner that Brown's case is similar to these two precedents. Like the unit in Consumers Power that wasn't quite fully ready and available for regular service in 1972 for its specifically assigned function, the Challenger wasn't first available for full operation in Brown's insurance business on a regular basis in 2003. And, just as the ethanol plant in Valley Natural Fuels needed to have all of its components in place and functioning in the right way to fulfill its specifically assigned function before we could find that it was placed in service, so too did the Challenger require installation of all of its necessary parts-- including the conference table and enlarged display screens--to fulfill its specifically assigned function before it was placed in service. Valley Natural Fuels is also helpful in its observation that there's nothing wrong in equating a

[*35] taxpayer's stated business objective for some feature (e.g., Brown's requirement that his plane have a conference table and larger screens to help him sell insurance) with an asset's "specifically assigned function." Much of the Code and regs is written in the passive voice, and it is sometimes hard to figure out who the actor in any particular sentence is supposed to be. Not so here. Cases like Consumers Power and Valley Natural Fuels tell us to look at the taxpayer--he's the one who gets to determine what an asset's "specifically assigned function" is. And here that asset's function wasn't just to fly Brown around; it was to be configured in a particular way to meet his very particular business needs. Even though an asset like the Challenger may be operational, it's not placed in service until it is operational for its intended use on a regular basis.

The Commissioner directs us next to 85 Gorgonio Wind Generating Co. v. Commissioner, T.C. Memo. 1994-544, 1994 WL 591909. That case started with a partnership that invested in two wind-turbine generators. Id. 1994 WL 591909 at *5. It acquired them, mounted drivetrains on towers, and even connected them to a grid by the end of 1985. Id. But they were fitted only with helicopter blades significantly shorter than those called for in the design specifications, and neither one had been equipped with a controller. Id. And although the turbines could produce electricity under favorable wind conditions through manual operation

**[*36]** with those blades, the lack of instrumentation prevented continuous ground-level monitoring of the wind turbines' sensors in an efficient manner. Id. (One of the turbines was fitted with an automatic controller in 1986, and the other one wasn't fitted until sometime after that. Id.) The partnership took depreciation deductions with respect to the turbines for 1985, but the Commissioner disallowed them for that year. Id. at *1, *6.

We found that the partnership acquired the generators "for the purpose of producing electricity for sale to a utility." Id. at *6. And we then found that "[n]either wind turbine acquired by the partnership was capable of regular, ongoing operation for the production of electricity during 1985." Id. We therefore found that in 1985 neither of the generators was placed in a condition of readiness and availability for its assigned function--the ongoing production of electricity. Id. Although we acknowledged that operation of the turbines without the controllers "was theoretically possible," it was "unlikely" that they could've been "operated on a regular, ongoing basis for the production of electricity without electronic controllers." Id. at *9. In conclusion, relying on Noell, Consumers Power, and Valley Natural Fuels, we held that since neither of the generators "[was] available for full service" in 1985, neither was placed in service that year. Id.

[*37]    These cases teach us that not just any use of an asset will satisfy the placed-in-service standard.  An asset must instead be available for *its intended use on a regular, ongoing basis* before we can find it "placed in service" in the tax year in question.  Brown argues, however, that in contrast to the wind turbines-- whose operation was "theoretically possible"--the Challenger's operation on December 30, 2003 "was not a question of theory, but a matter of plain fact.  As evidenced by the round trip flights halfway across the continent in 2003, there were no impairments to its full, regular functionality as a business aircraft in 2003."

But that's not what the cases tell us to look for.  The problem with the Challenger was that, although it would have been, as Brown said, "perfect for some buyers," it wasn't complete for him without the "two business requirements that [he] needed." And without those two post-2003 modifications, the Challenger wasn't "in a state of availability for the specific intended function in" Brown's insurance business in 2003.

We do agree with Brown that the caselaw does *not* require that an asset actually be used before it's regarded as "placed in service."  In <u>Sears Oil v. Commissioner</u>, 359 F.2d 191 (2d Cir. 1966), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1965-39, a barge was ready for use in the taxpayer's business by December

[*38] 1957, but couldn't actually be used because it was locked in ice in a canal until May 1958.  Id.  The Second Circuit held that because the barge was "ready for use" and "subject to the weather elements all winter," "[i]t seem[ed] only proper, in order to reflect the gradual deterioration of the completed asset that was taking place during this period, that part of the cost of the asset be allocated as a depreciation deduction to December 1957 and the remaining months of the winter of 1957-1958."  Id. at 198.   What we can glean from that holding is that it's possible for a taxpayer to place an asset in service for a certain tax year even without using it that year.  See Consumers Power, 89 T.C. at 725 ("[T]he assets in question [in Sears Oil] were held to have been placed in service during the taxable year because they were ready and available to perform their specifically assigned functions, even though the taxpayers were precluded from using the assets during the taxable year due to circumstances beyond their control").  Contrary to what Brown contends, however, Sears Oil *doesn't* stand for the different proposition that as long as an asset has been "used" in a certain year, it has also been "placed in service" that year.

Brown points us in his reply brief to one case--Hellings v. Commissioner, T.C. Memo. 1994-24, 2004 WL 17916--that does support his position.  In Hellings, two taxpayers formed a partnership on December 21, 1983 to engage in

[*39] sailboat chartering, and their partnership bought a sailboat that same day. Id., 2004 WL 17916 at *3. It quickly entered into a charter agreement for the final ten days of 1983 with a third party--Bay Yacht Agency--that both sold and managed boats. (It also entered into a separate charter agreement with Bay Yacht for 1984.) Since Bay Yacht didn't have a similar sailboat in stock, it wanted to have the sailboat available as a demonstration model to show prospective buyers-- and the parties agreed on a discounted fee because the boat would not be subject to the normal wear and tear of a regular charter. We found that, by the end of 1983, "the boat was fully equipped and charter-ready, except for sails *which could be easily borrowed*." Id. (emphasis added). The taxpayers took a depreciation deduction in 1983 for the sailboat, but the Commissioner disallowed it, because he thought that the boat wasn't placed in service until 1984. Id. at *1, *8.

We sided with the taxpayers. We found that the boat's "specifically assigned function * * * was use as a charter boat," and at the time the taxpayers purchased the boat "it was charter-ready." Id. at *8. Although we acknowledged that "additional equipment was added later, and the boat may not have been as attractive to prospective charterers at that time as it was after the additional equipment was added, the boat was sailable, and ready to be chartered" in 1983. Id. Although the Commissioner emphasized "that the boat was not actually in the

[*40] water when [the taxpayers] purchased it and was not placed in the water until April 1984," we found those facts not "controlling", noting that the boat was in the water two months before the taxpayers purchased it. Id. We also found persuasive the fact that the charter agreement between the partnership and Bay Yacht didn't restrict Bay Yacht from placing the boat in the water and sailing it. Id.

Brown contends that "[i]f a sailboat without sails, and apparently without an array of safety equipment, is ready for the assigned function of charter transportation," there's "no doubt that the Challenger was fully ready for the assigned function of transporting [him] when it was lacking only the conveniences of a conference table and larger video screens." Truly, if Hellings were the only case on point, we'd have to agree with Brown. But where we have gaps in the Code and regs that need to be welded or riveted together to keep like cases decided alike, any one case's persuasiveness often depends on how it treats earlier ones. In Hellings, we did not mention, much less distinguish, Noell, Consumers Power, or Valley Natural Fuels in concluding that the taxpayers placed the boat in service in 1983. And though we did find that the boat was "fully equipped" even without having sails, we also found that those sails "could be easily borrowed." Id. Perhaps the sail in that case were like jet fuel in this one--essential to making

**[*41]** the asset move, but so readily available that its absence at a particular time would not prevent the asset's being placed in service. But we have to admit that that'd be a stretch--so we think it best to confine Hellings to its peculiar facts. Consumers Power is a T.C. Opinion, so we must follow it -- which means that we should follow its reasoning as elaborated and illuminated by the facts of later cases that discuss it, and not a possible outlier that doesn't.

Brown understandably downplays the significance of the 2004 modifications. While acknowledging in his briefs that those modifications made the Challenger "more valuable to him" and allowed him to "more comfortably conduct business" as a passenger, he says they have "nothing to do with the Challenger's assigned function of transporting him for his business." The problem is that this posttrial framing just doesn't square with the trial testimony, in which Brown testified that those two modifications were "needed" and "required". We therefore find that the Challenger simply was not available for its intended use on a regular basis until those modifications were installed in 2004. Brown thus didn't place the Challenger in service in 2003 and can't take bonus depreciation on it that year.

**[\*42]** IV.    Penalties

A.    Fraud Penalty

Section 6663(a) imposes a penalty equal to 75% of the portion of the underpayment that is attributable to fraud.  The Commissioner asserted that the fraud penalty applied to some of the adjustments in the notices of deficiency.  He has the burden of proving fraud and, to do so, must have clear and convincing evidence that a taxpayer underpaid and that his underpayment was attributable to fraud.  Sec. 7454(a); Rule 142(b); Akland v. Commissioner, 767 F.2d 618, 621 (9th Cir. 1985), aff'g T.C. Memo. 1983-249.

However, that's only the general rule.  The burden can shift in some cases-- and it does so here because if the Commissioner proves that *any* part of the underpayment for a taxable year is attributable to fraud, then "the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of evidence) is not attributable to fraud."  Sec. 6663(b).  In the stipulation of settled issues, the Browns agreed that more than $1.8 million of the adjustments made to their income for 2003 will be subject to the fraud penalty.  This puts on

**[\*43]** them the burden of showing that the bonus-depreciation deduction taken for the Challenger in 2003 was not attributable to fraud.[19]

Fraud is the intentional wrongdoing with the specific purpose of avoiding a tax believed to be owed. See DiLeo v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). In other words, it's the "willful attempt to evade tax." Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Since direct proof of a taxpayer's fraudulent intent is rarely available, we usually look to circumstantial evidence to determine whether it exists. DiLeo, 96 T.C. at 874. Over the years, courts have developed a nonexclusive list of factors--often referred to as badges of fraud--that demonstrate fraudulent intent. Those badges include:

- understating income;

- maintaining inadequate records;

- failing to file tax returns;

- implausible or inconsistent explanations of behavior;

- concealing assets;

- failing to cooperate with tax authorities;

---

[19] In the case of a joint return--as there is here--section 6663 doesn't apply with respect to both spouses unless some part of the underpayment is due to both spouses' fraud. Sec. 6663(c). Mary Brown stipulated to the adjustments made in the stipulation of settled issues, so the burden also shifts with respect to her.

**[\*44]** •      filing false documents;

•      engaging in illegal activity; and

•      attempting to conceal illegal activity.

See Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992). We also consider a taxpayer's level of sophistication in tax matters. See Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), aff'g T.C. Memo. 1987-265.

The Browns point to several facts that they contend should negate the fraud penalty with respect to the bonus-depreciation deduction. They say that it's clear that Brown bought the Challenger in 2003, didn't misstate its cost, flew in it on December 30 of that year, and used it on that day to meet with people with whom he had a significant business connection.

The Commissioner would nevertheless focus us on three factors that he says support imposition of the fraud penalty for any portion of the underpayment due to the bonus-depreciation deduction:

•      the false "thank you" letters;

•      Brown's level of sophistication; and

•      Brown's pattern of substantially overstating deductions.

**[*45]** The Commissioner first contends that the "thank you" letters--purportedly from Mastro and Pasquale but really drafted by one of Brown's employees years later--were false documents. The Commissioner is correct that making false documents is one of the factors that indicates fraud. See, e.g., Spies, 317 U.S. at 499. Still, while these letters weren't actually written by Mastro or Pasquale, we know at least Pasquale did sign the one with his name on it. Thus, while the contents of Pasquale's letter were--as Pasquale mildly put it--"a little bit over the top," it's not clear that the contents of either letter were patently false.

But even if they were, we don't find that they bear on the fraud analysis here. It's well established that fraudulent intent must exist *at the time the taxpayer files the return*. See Gleis v. Commissioner, 24 T.C. 941, 952 (1995), aff'd, 245 F.2d 237 (6th Cir. 1957); Holmes v. Commissioner, T.C. Memo. 2012-251, at *37. We found that Brown (via Fitzgerald) generated those letters during the audit process; that is, actions that took place *after* the filing of the return. While we have said that postfiling events *can* indicate fraudulent intent at the time of filing, see Holmes, at *37, we don't see any evidence that Brown formed the intent to create those letters *when he filed the 2003 return*. Brown testified that his practice was to have Fitzgerald write letters on behalf of business associates only "when the IRS requests them"--that is, after a return has been filed. On the unusual facts

**[\*46]** of this case, we do find this bit of Brown's testimony credible, and it does persuade us that the letters are not good proof that Brown intended to evade tax at the time he filed his returns. See id. at \*41 (finding that "[A]lthough petitioner failed to cooperate with respondent's agents by intentionally submitting a false document, his failure does not compel the conclusion that he had a fraudulent intent in filing his 2000-04 tax returns"); id. at \*32 ("Although respondent has proffered some evidence of fraud, that evidence relates exclusively to petitioner's postfiling actions and does not convince us of his intention to evade tax when he filed his tax return for each year in issue").

The Commissioner also argues that we should factor in Brown's level of sophistication. He would have us weigh two other incidents that he says show Brown committed fraud--Brown's signature on a false letter to the California Board of Equalization to avoid California sales tax when he bought the Hawker and Fitzgerald's drafting of false letters for former employees to sign to corroborate that position. At trial, however, we didn't admit this extrinsic evidence to prove specific instances of Brown's conduct with respect to these collateral matters, see Fed. R. Evid. 608(b), and thus we won't let the

**[\*47]** Commissioner use it here to support a fraud finding through a backdoor argument that Brown's alleged bad acts show his sophistication.[20]

Lastly, the Commissioner argues that--by virtue of the stipulation of settled issues--Brown has engaged in a "four-year pattern of fraud," and that a "pattern of substantially overstating deductions supports a finding of fraud."  Generally a "pattern of underreporting in years not at issue does tend to show fraud," Fiore v. Commissioner, T.C. Memo. 2013-21, at \*18, "particularly when accompanied by other circumstances exhibiting an intent to conceal," Holmes, T.C. Memo. 2012-251, at \*32.  Indeed, the stipulation of settled issues reflects tens of millions of dollars of increased adjustments to income made to the Browns' returns between 2001 and 2006--including about $10 million resulting in underpayments subject to the fraud penalty.  That document does indicate a pattern of substantial underreporting of income.

We're not focusing here, however, on whether Brown committed fraud on the returns generally; rather we're looking at whether he has shown by a preponderance of evidence that he didn't commit fraud with respect to one specific

---

[20] The Commissioner also points out that even though Brown--as an experienced businessmen--was well aware of the need for contemporaneous substantiation, he failed to keep such records and instead resorted to create false, backdated letters.  As we stated above, those letters don't help support a finding of fraud because they were created after the filing of the returns.

[*48] deduction.  The Commissioner concedes that the bonus-depreciation deduction at issue is a legitimate business expense (albeit for 2004, not 2003).  While that concession alone certainly doesn't shield Brown from fraud, we also find persuasive that Brown actually bought the plane and took ownership of it in 2003.  And we also find noteworthy that Pasquale credibly testified that Brown flew to Chicago that year to talk business with him.

We do acknowledge that the absence of one of those facts would make it a closer call.  Cf. Hicks v. Commissioner, T.C. Memo. 2011-180, 2011 WL 3240843, at *3 (finding fraud when taxpayer improperly took depreciation deduction in 1998 on unfinished airplane that he flew once that year because neither did the taxpayer take delivery of it that year nor was there any evidence that he used it for any business purpose); Smith v. Commissioner, T.C. Memo. 1992-353, 1992 WL 137448 (finding fraud when taxpayers improperly took depreciation deduction on charter boat for 1982 instead of 1983 based on finding that taxpayers had no reasonable belief that boat was even delivered to its port of final destination--much less actually chartered--in 1982), aff'd without published opinion, 993 F.2d 1539 (4th Cir. 1993).  The facts here--although insufficient to

[*49] satisfy the placed-in-service standard[21]--taken together do show that Brown actually tried to meet the Code's requirements for bonus depreciation by the end of 2003, and we conclude that he has shown that he actually believed that he completed all of the steps necessary to use the plane in his business in 2003 which would allow him to properly claim the bonus-depreciation deduction for that year. We therefore find that Brown didn't intend to willfully evade tax when he claimed the bonus-depreciation deduction for 2003.[22]

## B. Accuracy-Related Penalty

But that doesn't necessarily mean that the Browns escape penalty free. As an alternative to the fraud penalty, the Commissioner seeks a 20% accuracy-related penalty under section 6662(a) on the underpayment of tax attributable to the disallowance of the bonus-depreciation deduction. The Commissioner, who

---

[21] We again note that we make no determination here whether Brown met his burden to substantiate qualified business use for the Challenger in 2003.

[22] This may have an unusual effect: The disallowance of the bonus-depreciation deduction may well be the only adjustment that causes an underpayment for 2003. And the parties stipulated not that a part of Brown's underpayment for 2003 was due to fraud but rather, that a portion of the adjustment to income "shall be subject to an addition to tax under [section] 6663." Section 6663(b) doesn't kick in unless the Commissioner proves that part of an *underpayment* is attributable to fraud. We will fly over, but note, the strangeness of section 6663's shifting the burden of proof when one can't tell until the end of a case whether there's actually been an underpayment.

**[\*50]** bears the burden of production as to the imposition of this penalty, see sec. 7491(c), argues for it on two separate grounds: "negligence" and "substantial understatement of income tax," <u>see</u> sec. 6662(b). We focus on the latter.

By definition, an understatement of income tax is "substantial" if it exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return." Sec. 6662(d)(1)(A). Here, Brown reported a tax liability of a mere $48 (arising solely from an additional tax on a tax-favored account) for 2003. After we add to income both the agreed adjustments from the stipulation of settled issues and the disallowed bonus-deprecation deduction, the understatement of the Browns' income tax is greater than $5,000--it's around $100,000. Because the Browns reported that they owed only $48, the total tax required to be shown on the return is around $100,000. Thus, the Commissioner has met his burden of production with respect to the substantial understatement.

Since the Commissioner has met that burden, to avoid the penalty the Browns must come forward with persuasive evidence that the Commissioner's penalty determination is incorrect. <u>See</u> Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446-47 (2001). They can meet this burden by showing that the penalty isn't appropriate because their return position was based on "substantial authority"

[*51] under section 6662(d)(2) or reasonable cause under section 6664(c).  See

Higbee, 116 T.C. at 446.

The Browns focus on substantial authority.  If taxpayers have shown "there

is or was substantial authority" for the tax treatment of an item, the amount of an

understatement subject to the penalty shall be reduced by the portion of the

understatement attributable to that item.  Sec. 6662(d)(2)(B).  The Browns contend

that they "relied on the express language of the Internal Revenue Code to support

their claim for bonus depreciation," and that "reliance was explicit" because

Brown told all of the other transaction participants "that he needed to use the

Challenger in his business before the end of the year to claim bonus depreciation."

And that reliance, they say, "is clearly reliance on 'substantial authority,' which

makes the penalty for substantial understatement of tax inapplicable."

That chain of reasoning doesn't persuade us.   First, the Browns don't cite to

the "express language" of the Code they allegedly relied on.  Assuming they're

referring to the term "placed in service" in section 168(k), we previously noted

that the discussion in their opening brief of that term was limited to one footnote

that didn't even discuss the regulation or any pertinent caselaw interpreting it.

Second, we're not sure why the Browns believe they can meet the substantial

authority standard on the basis that Brown told people he needed the plane by year

[*52] end to use in his business. Unlike applying the fraud standard, its irrelevant what Brown subjectively believed for purposes of determining substantial authority. See sec. 1.6662-4(d)(3), Income Tax. Regs. Rather, the "substantial authority standard is an objective standard involving an analysis of the law and application of the law to the relevant facts." Sec. 1.6662-4(d)(2), Income Tax Regs. And we will find the existence of substantial authority only "if the weight of the authorities"--which include the Code, regulations, and caselaw--"supporting the treatment is substantial in relation to the weight of authorities supporting contrary treatment." Sec. 1.6662-4(d)(3), Income Tax Regs. Not until their reply brief did the Browns even discuss the key regulation that required the Challenger be "in a condition or state of readiness and availability for [its] specifically assigned function." See sec. 1.167(a)-11(e)(1), Income Tax Regs. Even then they were able to cite only one case favorable to their position (Hellings, T.C. Memo. 1994-24), and that case--which we have determined is materially distinguishable on its facts, see sec. 1.6662-4(d)(3)(ii), Income Tax Regs.--was substantially outweighed by other cases that compel us to a contrary treatment. And because the Browns didn't even attempt to construe the term "placed in service" in a manner favorable to themselves, we cannot say that they have established substantial authority by providing "a well-reasoned construction of the applicable

[*53] statutory provision." See id. Thus, we find that the Browns haven't established there is or was substantial authority to claim the bonus-depreciation deduction for 2003. See sec. 1.6662-4(d)(3)(iv)(C), Income Tax Regs.

Taxpayers can also except themselves from the section 6662 penalty with respect to any portion of an underpayment if they can establish that, under all the facts and circumstances, they acted with reasonable cause and in good faith. Sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs. This determination turns on the pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Id. The most important factor generally is the taxpayers' efforts to assess their proper tax liability. Id. However, other than relying solely on their substantial-authority argument to show they also acted with reasonable cause and in good faith, the Browns don't bring forth any evidence--for example, reliance on their CPA's advice or some credible proof that they were aware of Hellings and the other cases when they filed their returns--showing how they did so.

[*54] The Browns therefore have not met their burden, and we sustain the Commissioner's determination that they are liable for an accuracy-related penalty based on a substantial understatement.[23]

Decisions will be entered

under Rule 155.

---

[23] Our finding of a section 6662 penalty based on a substantial understatement means that we don't need to address the Commissioner's argument that the Browns are also subject to that penalty on account of negligence.